# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**FRANCIS M. DUFFY, Ph.D**
**6380 Fireside Haven Drive**
**Sykesville, MD 21784,**

**STANLEY PETER, JR.**
**17604 Garrett Drive**
**Gaithersburg, MD 20878,**

**THE MACHINE GUN NEST**
**7910 Reichs Ford Rd.**                     **Case No.**
**Frederick, MD 21704,**

**ENGAGE ARMAMENT LLC**
**701 E. Gude Dr., Ste 101**
**Rockville, Maryland 20850**

**MARYLAND SHALL ISSUE, INC.**
**9613 Harford Rd., Ste C #1015**
**Baltimore, Maryland 21234,**

 *Plaintiffs,*

              **v.**

**WESTLEY MOORE, in his official**
**capacity as Governor of Maryland,**

**MICHAEL A. JACKSON, in his**
**official capacity as Acting**
**Superintendent of the Maryland State**
**Police,**

*Defendants.*

## COMPLAINT FOR DECLARATORY AND EQUITABLE RELIEF
## AND ATTORNEY'S FEES AND COSTS

COME NOW, the Plaintiffs, through counsel, sue the Defendants, and for cause state as follows:

1

**INTRODUCTION**

1.     On, April 10, 2026, the General Assembly of Maryland enacted Senate Bill 334 ("SB 334" or "the Bill"), and defendant Governor Westley Moore, signed SB 334 into law on May 26, 2026. 2026 Maryland Session Laws, Ch. 771. SB 334 goes into effect on October 1, 2026. SB 334 amends MD Code, Criminal Law, §§ 4-301 and 4-302, and creates a new section, MD Code, Criminal Law, § 4-302.2, which provides that "[o]n or after January 1, 2027, a person may not manufacture, sell, offer for sale, purchase, receive, or transfer a machine gun convertible pistol." A "machine gun convertible pistol" is defined to include "any semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or by using common household tools into a machine gun by the installation or attachment of a pistol converter as a replacement for the slide's backplate." MD Code, Criminal Law, 4-302(o)(1). SB 334 is principally aimed at one manufacturer, GLOCK GES.M.B.H., based in Deutsch-Wagram, Austria, and its subsidiary, GLOCK, INC., based in Smyrna, Georgia (collectively referred to herein as "Glock"), which together market semi-automatic Glock pistols in the United States and throughout the world. All factory stock Glock pistols, since the date of manufacture, have made use of a "cruciform trigger bar" as part of their basic design.

2.     Factory stock Glock pistols are in common use for lawful purposes throughout the world and the United States and are among the most popular pistols sold in the United States. While SB 334 does not ban continued possession of Glock pistols purchased or acquired prior to January 1, 2027, the operative provisions of SB 334 ban the sale, offer for sale, purchase, transfer and receipt of Glock pistols in Maryland, effective January 1, 2027. Those bans also effectively destroy the market value of all Glock pistols currently possessed by Marylanders, including Glock pistols legally owned and possessed by individuals and federal firearms licensees. SB 334's bans on factory

stock Glocks and other similar pistols manufactured with a cruciform trigger bar violate the Second Amendment to the United States Constitution.

3.    The individual Plaintiffs are ordinary, law-abiding citizens who currently own factory stock Glock pistols and/or other pistols with a cruciform trigger bar and intend to continue to acquire factory stock Glock pistols and other pistols with a cruciform trigger bar after January 1, 2027. Each of the individual Plaintiffs possesses Glock pistols or other pistols with a cruciform trigger bar and intend to acquire and would acquire Glock pistols and other such pistols with a cruciform trigger bar after January 1, 2027, but will refrain from doing so because of a reasonable fear of prosecution under SB 334. Each of the individual plaintiffs is a "designated collector" within the meaning of State law, MD Code, Public Safety, § 5-129. Each of the individual Plaintiffs is a certified handgun instructor within the meaning of MD Code, Public Safety, § 5-101(q). Each of the individual Plaintiffs use and temporarily transfer Glock pistols to students in conducting instruction for which he receives compensation.

4.    The Plaintiff federal and State firearms licensees routinely sell, purchase, offer for sale, receive and transfer factory stock Glock pistols and other pistols with a cruciform trigger bar as an integral part of their businesses. Plaintiff federal and State firearms licensees represent their own interests as well as the interests of their customers in acquiring such pistols in Maryland after bans imposed by SB 334 go into effect on January 1, 2027. Plaintiff Maryland Shall Issue, Inc., has members in Maryland who currently possess factory stock Glock pistols or other pistols with a cruciform trigger bar and who likewise intend to acquire such pistols after January 1, 2027, but will refrain from doing so because of fear of prosecution under SB 334. This Court should declare that SB 334 violates the Second Amendment of the United States Constitution and enter judgment enjoining enforcement of the bans imposed by SB 334.

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, as this Complaint seeks relief afforded by 42 U.S.C. § 1983, for past, continuing, and imminent violations of Plaintiffs' rights arising under the United States Constitution. Defendants reside or are otherwise found in the District of Maryland. The events, actions, and omissions challenged in this Complaint arise in Maryland. Venue is properly in this Court pursuant to 28 U.S.C. § 1391. Plaintiffs seek declaratory relief as authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

**CHALLENGED PROVISIONS**

6.      This suit challenges Senate Bill 334, 2026 Maryland Session Laws, Ch. 771 ("SB 334"), which was signed into law by Defendant Governor Westley Moore on May 26, 2026. As enacted, SB 334 amends MD Code, Criminal Law, §§ 4-301, 4-302, and creates a new section in the Maryland Criminal Code, Section 4-302.2, which provides (with few exceptions not relevant here) that "on or after January 1, 2027, a person may not manufacture, sell, offer for sale, purchase, receive, or transfer a machine gun convertible pistol." MD Code, Criminal Law, § 4-305.2(a). These prohibitions include private sales of pistols that would otherwise be lawful under MD Code, Public Safety, § 5-124. SB 334 bans acquisitions, sales, transfers, purchases, receipts and offers for sale of convertible pistols, regardless of whether these activities take place through a dealer or through non-dealer private transactions, as otherwise permitted by MD Code Public Safety, § 5-124(a)(1),(2). These bans are not limited to the commercial purchase, sale, receipt, or transfer of factory stock Glocks and other pistols with a cruciform trigger bar by licensed dealers. A first offense of any of these prohibitions is punishable under MD Code, Criminal Law, § 4-306(a), by "imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both." Conviction of this offense would impose

4

a lifetime firearms disability under State law, MD Code, Public Safety, § 5-101(g)(3), and under federal law, 18 U.S.C. § 921(a)(20), and 18 U.S.C. § 922(g)(1).

7. SB 334 defines a "machine gun convertible pistol" to mean "any semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or by using common household tools into a machine gun by the installation or attachment of a pistol converter as a replacement for the slide's backplate." MD Code, Criminal Law, § 4-301(o)(1). It further defines "machine gun convertible pistol" to include "a semiautomatic pistol described under paragraph (1) of this subsection, regardless of whether a tab or other piece of material is located on the rear portion of the pistol frame to block the attachment of a pistol converter, if the tab or other piece of material can be readily removed with a common household tool." *Id.* 4-301(o)(2). The term "does not include a hammer–fired semiautomatic pistol or a striker–fired semiautomatic pistol without a cruciform trigger bar." *Id*. at 4-301(o)(3). SB 334 instructs the Maryland State Police to "adopt regulations to implement this section, including publishing a list of prohibited machine gun convertible pistols. MD Code, Criminal Law, § 4-305.2(b). As of the date of this Complaint, the Maryland State Police have not yet published any such list.

8. SB 334 defines a "cruciform trigger bar" to mean a component in a semiautomatic pistol that: "(1) serves as a link between the trigger and the firing pin; and (2) has its sear incorporated into a cross–shaped surface." *Id*. at 4-301(j). SB 334 defines a "pistol converter" to mean "any device or instrument that, when installed in or attached to the rear of the slide of a semiautomatic pistol, replaces the backplate and interferes with the trigger mechanism, which enables the pistol to shoot automatically more than one shot by a single function of the trigger." *Id*. at 4-301(p)(1).

9.      The definition for a "pistol converter" encompasses what are commonly termed "switches" or "auto-sears." Such devices fall within the definition of a "machinegun" under federal law. 26 U.S.C. § 5845(b). With exceptions not relevant here, it is a federal felony to possess, manufacture, transfer or receive a machinegun under federal law. 28 U.S.C. § 922(o); 26 U.S.C. § 5861. A knowing violation of Section 922(o) is punishable by imprisonment by not more than 10 years. 28 U.S.C. § 924(a)(2). A violation of Section 5861 is punishable by a fine of $250,000, or by imprisonment of not more than 10 years, or both. 26 U.S.C. § 5871.

10.      As amended by SB 334, Maryland law classifies such a "pistol converter" or switch as a "rapid fire activator." Maryland Code, Criminal Law, § 4-301(m)(2). Maryland law prohibits the transport of any "rapid fire activator" and further provides that a person may not "manufacture, possess, sell, offer to sell, transfer, purchase, or receive a rapid fire activator." MD Code, Criminal Law, § 4-305.1(a). A violation of this provision is a misdemeanor and punishable by "imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both." MD Code, Criminal Law, § 4-306(a).

11.      SB 334 carves out several exceptions from the bans it imposes, including sales to "law enforcement personnel of the State or a local unit in the State" if such purchases are within the "official business" of such personnel. MD Code, Criminal Law, § 4-302(1). Similarly, SB 334 permits "the sale, offer for sale, purchase, receipt, or transfer of a machine gun convertible pistol to or by a person who: (i) is currently a law enforcement official, as defined in § 4–201 of this title; or (ii) has retired as a law enforcement official in good standing from a law enforcement agency of the United States, the State or another state, or a local unit in the state or another state and possesses a valid credential issued under 18 U.S.C. § 926C." *Id*. at 4-302(14). SB 334 also permits "the temporary gratuitous exchange of a machine gun convertible pistol." *Id*. at 4-302(13).

12. All factory stock models of Glock pistols are equipped with a "cruciform trigger bar" including the latest models of the Glock pistols, the factory stock "Gen 6" and "V series" Glock pistols that were first distributed by Glock in the United States in late 2025. The cruciform trigger bar acts as the primary sear, pulling and holding the firing pin back and is an integral part of Glock's SAFE ACTION® System in which the trigger bar interacts with a specially designed safety ramp within the rear trigger mechanism housing. Under that system, the firing pin cannot strike a cartridge unless and until the trigger bar is pulled rearward, which moves the cruciform down the ramp, releasing the sear from the energized firing pin. This system ensures that the pistol cannot go off accidentally or unintentionally if the pistol is dropped while loaded.

13. Other manufacturers, including but not limited to Palmetto State Armory, ZEV Technologies, Shadow Systems, Lone Wolf Arms, and Sturm & Ruger, likewise make factory stock pistols that make use of a "cruciform trigger bar." These models of non-Glock pistols with a cruciform trigger bar are commonly and informally called "Glock clones" because they make use of Glock designs, including the design for a cruciform trigger bar, for which Glock's patents expired in 2020. Federal law permits dealer-to-dealer transfers of handguns in interstate commerce but otherwise bars the receipt of a handgun by any person who is an out-of-state resident. 18 U.S.C. § 922(a)(1). Under this provision, Maryland residents, including the individual Plaintiffs, may not purchase and receive a factory stock Glock pistol or Glock clone pistol in another state.

14. Earlier factory stock models of Glock pistols, including Gen 3, Gen 4 and Gen 5 pistols, and Glock clone pistols with a cruciform trigger bar could be fitted with a "switch" or "auto-sear" or "pistol converter" (collectively "a switch") by illegally modifying the frame of the pistol and by replacing the backplate of the slide with a switch on the rear of the slide of the pistol. These modifications enabled the pistol to shoot automatically more than one shot by a single function of

7

the trigger. These switches are not manufactured by Glock but rather are illegally imported from abroad or manufactured by criminals. Any manufacture or possession of such a switch and any possession of any such modified Glock pistol or a Glock clone would constitute a federal felony under 28 U.S.C. § 922(o) and 26 U.S.C. § 5861. The manufacture or possession of a switch or of a Glock pistol or Glock clone modified with a switch would also constitute a separate misdemeanor violation of MD Code, Criminal Law, § 4-305.1(a).

15.    The latest models of factory stock Glock pistols, the "Gen 6" and "V series" models, are specifically designed to defeat the installation of switches. The Gen 6 and V series pistols feature a redesigned frame and rear slide geometry by adding metal ramps around the sear and changes the slide backplate and internal components, all of which are designed to prevent, and do in fact prevent, the installation of "switches." The factory stock "Gen 6" and "V series" models continue to use a cruciform trigger bar. Notwithstanding these design changes, and on information and belief, Plaintiffs state that the Maryland State Police intend to add factory stock "Gen 6" and "V series" pistols to the list of banned pistols that the State Police are required to publish under SB 334, MD Code, Criminal Law, § 4-305.2(b).

16.    Maryland law conditions the sale of a pistol in Maryland on the prior approval of the pistol by the Handgun Roster Board ("Roster Board"), which is part of the Department of the Maryland State Police. MD Code, Public Safety, § 5-404. MD Code, Public Safety, § 5-406(a)(2) provides that "[a] person may not sell or offer for sale in the State a handgun manufactured after January 1, 1985, that is not included on the handgun roster."

17.    The Roster Board is charged with the duty "to (1) compile and maintain a handgun roster of authorized handguns that are useful for legitimate sporting, self-protection, or law enforcement purposes; (2) annually publish the handgun roster in the Maryland Register; and (3)

8

semiannually send a copy of the handgun roster to all persons who hold a State regulated firearm dealer's license under Subtitle 1 of this title." MD Code, Public Safety, § 5-405. Approval for the sale of the pistol by the Roster Board is obtained only after the Board has considered a specific range of factors, including "quality of materials," "quality of manufacture," "reliability as to safety" and "utility for legitimate sporting activities, self-protection, or law enforcement." MD Code, Public Safety, §§ 5-405(b)(4),(5),(6) & (9).

18.    There is no exception from the bans imposed by Section 5-406 for sales to law enforcement officers or law enforcement agencies of Maryland. MD Code, § 5-402. Rather, the suitability or usefulness of a pistol for "law enforcement purposes" is part of the criteria for Roster Board approval under MD Code, Public Safety, § 5-405. Section 5-402(b)(1) provides that "[a] person is not strictly liable for damages for injuries to another that result from the criminal use of a firearm by a third person."

19.    All models of factory stock Glock pistols manufactured by Glock prior to the latest models ("Gen 6" and "V Series" models) have been approved by the Roster Board and are currently listed on the Maryland handgun roster. https://licensingportal.mdsp.maryland.gov/MSPBridgeClient/#/home. Glock "V Series" pistols, first distributed by Glock in the United States in late 2025, have also been approved by the Roster Board and are on the roster. *Id.* Glock "Gen 6" pistols, also first distributed in the United States in late 2025, were approved by Roster Board on June 3, 2026, and that approval takes effect on or about July 26, 2026. Numerous "Glock clones" have also been approved for sale in Maryland by the Roster Board, including without limitation, one or more models of pistols manufactured by Palmetto State Armory, ZEV Technologies, Shadow Systems, Lone Wolf Arms, and Sturm & Ruger. Factory stock Glock handguns are standard issue equipment of numerous law enforcement

9

agencies in Maryland, including the Maryland State Police, the Maryland Capitol Police and the Baltimore Police Department.

**PARTIES**

**Plaintiffs:**

20.    Plaintiff FRANCIS M. DUFFY, Ph.D, is a Maryland resident and is a member of the Board of Directors of Plaintiff Maryland Shall Issue, Inc. ("MSI"). He is an Army Special Forces veteran, a graduate of the Army Ranger School and was a certified Special Forces Combat Diver. He holds a master's degree and a Doctor of Philosophy degree from the University of Pittsburgh, and a master's degree from Johns Hopkins University. He also is a "qualified handgun instructor" under MD Code Public Safety, § 5-101(q), and a handgun instructor certified by the National Rifle Association ("NRA") and the U.S. Concealed Carry Association ("USCCA"). He possesses a valid Handgun Qualification License under MD Code, Public Safety, § 5-117.1, and is entitled to purchase handguns in Maryland. He is also a "designated collector" within the meaning of State law, MD Code, Public Safety, § 5-129, and is thus entitled to purchase more than one handgun during a 30-day period.

21.    Plaintiff FRANCIS M. DUFFY, Ph.D, currently owns numerous pistols, including numerous Glock pistols, and regularly uses and temporarily transfers Glock pistols to students in and during instruction for which he is compensated by students. He principally uses factory stock Glock pistols in that instruction because Glock pistols are reliable and simple to operate for beginners. But for SB 334, he would acquire factory stock Glock pistols either from a State licensed dealer or on the secondary market after January 1, 2027, but will refrain from doing so because he fears prosecution under SB 334. But for SB 334, he would continue to engage in the temporary transfer of such Glock pistols to students during instruction for which he receives compensation but

10

will refrain from doing so after January 1, 2027, for fear of prosecution under SB 334. SB 334's prohibitions on transfers of Glocks and Glock clones with a cruciform trigger bar will effectively preclude the use of these pistols in instruction for which compensation is received. The bans imposed by SB 334 effectively destroy the market value of these pistols which he already owns. That destruction of the market value of these Glock pistols and the inability to continue to use Glock pistols in paid instruction will inflict monetary losses on him.

22.    Plaintiff STANLEY PETER, Jr., is a Maryland resident and retired as an officer from the United States Air Force where he served as a B-52 Navigator. He is a graduate of the United States Air Force Weapons School. He has a bachelor's degree in mathematics (B.S.) and a master's degree (M.S.) in International Relations, and a master's degree (M.S.) in Operations Research. He is currently employed as a Department of Defense Contractor providing modeling and simulation analysis services. He also is a "qualified handgun instructor" under MD Code, Public Safety, § 5-101(q), and is also certified by the National Rifle Association as a Training Counselor and Chief Range Safety Officer. He is qualified to instruct numerous firearms related courses, such as pistol, rifle, shotgun, range safety, concealed carry and cartridge reloading. As a veteran, he is exempt from needing a Handgun Qualification License under MD Code, Public Safety, § 5-117.1(a)(3), and is legally permitted to purchase handguns in Maryland. He is also a "designated collector" within the meaning of State law, MD Code, Public Safety, § 5-129, and is thus entitled to purchase more than one handgun during a 30-day period. He is a life member of Plaintiff Maryland Shall Issue, Inc.

23.    Plaintiff STANLEY PETER, Jr., currently owns numerous rifles, shotguns and pistols, including factory stock Glock pistols, and uses and temporarily transfers factory stock Glock pistols to students in and during instruction for which he is compensated by students. From time to

time he will sell handguns, including Glock pistols, as permitted by Maryland law, but will refrain from doing so on and after January 1, 2027, because he fears prosecution under SB 334. But for SB 334, he would acquire factory stock Glock pistols either from a State licensed dealer or on the secondary market after January 1, 2027, but will refrain from doing so because he fears prosecution under SB 334. But for SB 334, he would continue to engage in the temporary transfer of such Glock pistols to students during instruction for which he receives compensation but will refrain from doing so after January 1, 2027, for fear of prosecution under SB 334. SB 334's prohibitions on transfers of Glocks and Glock clones with a cruciform trigger bar will preclude the use of these pistols during instruction for which compensation is received. The bans imposed by SB 334 effectively destroy the market value of Glock pistols he already owns. That destruction of the market value of these Glock pistols and the inability to continue to use Glock pistols in paid instruction will inflict monetary losses on him. He is an individual member of Plaintiff Maryland Shall Issue, Inc.

24.     THE MACHINE GUN NEST is a Maryland corporation located on private property within Frederick County, Maryland, at 7910 Reichs Ford Rd. Frederick, MD 21704. Pursuant to 18 U.S.C. § 923, The Machine Gun Nest is a federally licensed firearms dealer at its current location. See 27 C.F.R. § 478.41 *et seq*. The Machine Gun Nest is also a Maryland State licensed firearms dealer and is thus authorized by State law to engage "in the business of selling, renting or transferring regulated firearms." MD Code, Public Safety, § 5-106. As part of its business, The Machine Gun Nest regularly sells all models of factory stock Glock pistols as well as pistols manufactured by other brands that utilize a cruciform trigger bar, including pistols made by Palmetto State Armory, ZEV Technologies, Shadow Systems, Lone Wolf Arms, and Sturm & Ruger.

25.     The sale of Glock handguns and other handguns with a cruciform trigger bar make up a significant part of the gross revenue annually of The Machine Gun Nest. Since opening in 2015,

12

The Machine Gun Nest has transferred thousands of Glock pistols, including nearly 500 in the last 18 months alone. The Machine Gun Nest also maintains 48 Glocks and Glock-style handguns in its rental inventory so new shooters can "try before they buy." The Machine Gun Nest range employs multiple full-time Maryland certified instructors under MD Code, Public Safety, § 5-101(q). Glocks are a foundational tool in instruction programs run by The Machine Gun Nest. The Machine Gun Nest currently has nearly 100 classes projected through 2027, all of which incorporate the temporary transfer of factory stock Glock pistols to students. The Machine Gun Nest receives compensation for such instruction.

26.     But for SB 334, The Machine Gun Nest would continue to receive, offer for sale, purchase and sell and transfer factory stock Glock pistols and other pistols with a cruciform trigger bar after January 1, 2027, but will refrain from doing so for fear of prosecution under SB 334. But for SB 334 The Machine Gun Nest would continue to engage in the temporary transfer of such Glock pistols to students during instruction for which it receives compensation but will refrain from doing so for fear of prosecution under SB 334. SB 334's prohibitions on the sale, offer for sale, the receipt and on transfers of Glocks and Glock clones with a cruciform trigger bar preclude the use of these pistols in instruction and effectively destroys the market value of these pistols which are already owned and used by The Machine Gun Nest for instruction.

27.     The prohibitions imposed by SB 334 will adversely affect sales and will cause lost profits from sales that The Machine Gun Nest would have made of these pistols but for the enactment of SB 334. SB 334's prohibitions on the sale, offer for sale, the receipt and on transfers of Glocks and Glock clones with a cruciform trigger bar will effectively destroy the market value of these pistols in the inventory of The Machine Gun Nest after January 1, 2027. The Machine Gun Nest has standing to sue for the harm caused to its own business by SB 334 and further has standing

13

to represent the interests of its customers who have a constitutionally protected interest in the acquisition and sale of Glock pistols and Glock clone pistols with a cruciform trigger bar. *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020). The Machine Gun Nest is a corporate member of Plaintiff Maryland Shall Issue, Inc.

28.    ENGAGE ARMAMENT, LLC ("Engage") is a Maryland corporation located on private property within Montgomery County, Maryland, at 701 E. Gude Dr., Ste 101, Rockville, Maryland 20850. Pursuant to 18 U.S.C. § 923, Engage is a federally licensed Type I dealer (retail dealer) a Type VII dealer (firearms manufacturer) and Type X dealer (manufacturer of destructive devices and ammunition for such devices). See 27 C.F.R. § 478.41 *et seq*. Pursuant to MD Code, Public Safety, § 5-106, Engage is also a Maryland State licensed firearms dealer and is thus authorized by State law to engage "in the business of selling, renting or transferring regulated firearms." As part of its business, Engage regularly sells all models of factory stock Glock pistols as well as pistols manufactured by other brands that utilize a cruciform trigger bar, including pistols made by Palmetto State Armory, ZEV Technologies, Shadow Systems, Lone Wolf Arms, and Sturm & Ruger. The sale of factory stock Glock handguns and other handguns with a cruciform trigger bar makes up approximately 20% of the gross revenue annually of Engage. In the past 18 months Engage has sold or transferred 646 factory stock Glock pistols.

29.    The sale of Glock handguns and other handguns with a cruciform trigger bar make up a significant proportion of the gross revenue annually of Engage. But for SB 334, Engage would continue to receive, offer for sale, purchase, sell and transfer factory stock Glock pistols and other pistols with a cruciform trigger bar after January 1, 2027, but will refrain from doing so for fear of prosecution under SB 334. SB 334's prohibitions on the sale, offer for sale, the receipt and on transfers of Glocks and Glock clones with a cruciform trigger bar will effectively destroy the market

14

value of these pistols in Engage's inventory after January 1, 2027. These prohibitions will cause lost profits from sales that Engage would have made of these pistols but for the enactment of SB 334. Engage has standing to sue for the harm caused to its own business by SB 334 and further has standing to represent the interests of its customers who have a constitutionally protected interest in the acquisition and sale of Glock pistols and Glock clone pistols with a cruciform trigger bar. *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020). Engage is a corporate member of Plaintiff Maryland Shall Issue, Inc.

30.    Plaintiff MARYLAND SHALL ISSUE, INC. ("MSI") is a Maryland corporation, located at 9613 Harford Rd., Ste C #1015, Baltimore, MD 21234. MSI is an Internal Revenue Service Section 501(c)(4), non-profit, non-partisan, all-volunteer membership organization with approximately 2000 members statewide. MSI is dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. The purposes of MSI include promoting the exercise of the right to acquire, keep and bear arms and education, research, and legal action associated with the constitutional right to privately acquire, own, possess and carry firearms. Each of the named individual plaintiffs and dealer plaintiffs is a member of MSI.

31.    MSI has one or more individual members who live in Maryland and who lawfully own factory stock Glock pistols or Glock clones that are manufactured with "cruciform trigger bars." MSI has one or more members who intend to acquire, sell or transfer factory stock Glock pistols after January 1, 2027, but will refrain from doing so because they reasonably fear prosecution under SB 334 if they do so on or after January 1, 2027. MSI has one or more members who are State certified firearms instructors who use and temporarily transfer factory stock Glock pistols to students

15

in instruction for which they are compensated. One or more of these instructor members intend to acquire, sell or temporarily transfer factory stock Glock pistols on or after January 1, 2027, but will refrain from doing so because they reasonably fear prosecution under SB 334 if they do so on or after January 1, 2027.

32.     MSI brings this action on behalf of its members, including its member instructors and federal and State licensed dealers, who currently own factory stock Glock pistols or other pistols with cruciform trigger bars, who intend to acquire and would acquire Glock pistols or other pistols with cruciform trigger bars after January 1, 2027, but will refrain from doing so because they reasonably fear prosecution under SB 334. MSI has associational standing to represent the interests of its individual members and its dealer members. Those interests of its members are germane to the mission and purpose of MSI and the participation of these members is not necessary or desirable for a full and fair adjudication of the claims alleged in this Complaint.

33.     MSI has one or members who are State and federally licensed firearms dealers who sell, transfer, offer for sale, and receive factory stock Glock pistols and Glock clone pistols with cruciform trigger bars. These licensed dealer members intend to engage in each of these actions on or after January 1, 2027, and would do so but for fear of prosecution under SB 334. MSI has associational standing to represent the interests of each of these State and other federally licensed dealers who are members of MSI. The interests of MSI's licensed dealer members are germane to the mission and purpose of MSI and the individual participation of these member dealers is not necessary or desirable for a full and fair adjudication of the claims alleged in this Complaint.

**Defendants:**

34.     The Defendant, WESTLEY MOORE, is the Governor of Maryland and, as head of the executive branch of the State of Maryland, is responsible for the enforcement of State laws and

regulations issued by State regulatory agencies, including the Department of the State Police. Additionally, as Governor, Moore may direct the Attorney General to undertake criminal investigations and prosecutions. Md. Const. art V, § 3; *see also In re Special Investigation No. 244*, 459 A.2d 1111, 1115 (Md. 1983). Defendant Moore maintains his principal office at 100 State Circle, Annapolis, Maryland 21401-1925, and is sued in his official capacity.

35.    The Defendant MICHAEL A. JACKSON, is the Acting Superintendent of the Maryland State Police, and as such, "enforce[s] the laws and ordinances of the State, counties, and municipal corporation." MD Code, Public Safety § 2-301(a)(2)(iii). Defendant Jackson is also specifically empowered to conduct investigations into the lawfulness of sales of handguns and other regulated firearms by State licensed dealers. MD Code, Public Safety, § 5-145. The Department of the Maryland State Police is under Defendant Jackson's supervision, command and control and is directed by SB 334 to create a list of handguns which are subject to the bans imposed by SB 334. MD Code, Criminal Law, § 4-305.2(b). Defendant Jackson maintains his principal office at 1201 Reisterstown Road, Pikesville, MD 21208, and is sued in his official capacity.

## THE SECOND AMENDMENT

36.    The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Second Amendment is applicable to the States as incorporated through the Due Process Clause of the Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional right essential to ordered liberty. *McDonald v. City of Chicago*, 561 U.S. 742 (2010). "[T]he Second Amendment embodies a uniform national standard" that is equally applicable to the States and the federal government. *Wolford v. Lopez*, No. 24–1046, 609 U.S. ---, ---- S.Ct. ----, 2026

WL 1825723, slip op. at 6 (U.S. June 25, 2026). "The right protected by the Second Amendment is entitled to no less protection than other constitutional rights." *Wolford,* slip op. at 18 n.12.

37.     "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). Under the Second Amendment, "Arms" comprises "weapons of offence," "armour of defence," and "anything that a man wears for his defence ... takes into his hands, or useth in wrath to cast at or strike another." *Heller,* 554 U.S. at 581. "'Arms' ... refers to implements used for offense or defense." *Wolford,* slip op. at 3, quoting *Heller,* 554 U.S. at 581. A "law . . . clashes with the 'plain text' of the Amendment's language" if it "concern[s] any form of 'Arms'  *i.e.,* any weapon customarily used for offensive or defensive purposes." *Wolford*, slip op. at 7. "Arms" need not be necessary for a firearm's functioning but instead need only "facilitate armed self-defense." *Bruen,* 597 U.S. at 28. See also *Caetano v. Massachusetts*, 577 U.S. 411 (2016); *Nunn v. State*, 1 Ga. 243, 251 (1846) ("The right of the whole people ... to keep and bear arms of every description ... shall not be infringed, curtailed, or broken in upon, in the smallest degree ....").

38.     "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. See also *United States v. Hemani,* No. 24–1234, 608 U.S. ---, --- S.Ct. ----, 2026 WL 1751710 at *4 (2026) ("we begin by asking whether the Amendment's terms cover the conduct in question" and if so "the Constitution 'presumptively' protects it"), quoting *Bruen,* 597 U.S. at 24. "If a challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional." *Wolford*, slip op. at 7. This textual inquiry is determined by whether "the law place[s] any restrictions on either the "keep[ing]" (*i.e.*, possession) or the "bear[ing]" (*i.e.,* carrying) of arms." *Id*., quoting *Bruen*, 597

18

U.S. at 32-33. (brackets by the Court). "[H]istorical materials and precedents" "are out of place at *Bruen*'s first step." *Wolford*, slip op. at 16. Rather, "the question is simply whether a challenged law falls within the Second Amendment's 'plain text." *Id.*, quoting *Bruen*, 597 U. S. at 24. A court may not "smuggle additional limits, drawn from our regulatory tradition into the plain-text stage of the inquiry." *Wolford,* slip op. at *14 n.1 (Barrett, J., concurring).

39.    "Arms" under the Second Amendment includes handguns. *Heller* struck down as unconstitutional the District of Columbia's ban on the possession of handguns, holding that the Second Amendment protects arms that are in common use for lawful purposes, like self-defense, including handguns. 554 U.S. at 624-27. See *Bruen,* 597 U.S. at 32 (noting that is no dispute "that handguns are weapons 'in common use' today for self-defense"), quoting *Heller,* 554 U.S. at 627. *Heller* holds that "the American people have considered the handgun to be the quintessential self-defense weapon." 554 U.S. at 629. Handguns are "the most popular weapon" for "the core lawful purpose of self-defense." *Heller,* 554 U.S. at 629–30. See also *McCoy v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 140 F.4th 568, 575 (4th Cir. 2025), *cert. denied*, No. 25-24, 2026 WL 1871297 (U.S. June 30, 2026) ("As *Heller* made clear, handguns are 'Arms' because they are 'the quintessential self-defense weapon.'"), quoting *Heller,* 554 U.S. at 629; *Wolford,* slip op. at 3 ("We added [in *Heller*] that handguns, which are 'overwhelmingly chosen by American society' for self-defense, fall squarely into this category"), quoting *Heller,* 554 U.S. at 628.

40.    The text of the Second Amendment necessarily protects the right of a law-abiding citizen to acquire handguns. Any restriction on the acquisition of arms necessarily is a restriction on the "keeping or bearing" of arms as a person cannot "keep or bear" arms that the person cannot legally acquire. See *Reese v. BATF*, 127 F.4th 583, 590 (5th Cir. 2025) ("the right to 'keep and bear arms' surely implies the right to purchase them."); *Ortega v. Grisham*, 148 F.4th 1134, 1143 (10th

19

Cir. 2025) ("Common sense dictates that the right to bear arms requires a right to acquire arms, just as the right to free press necessarily includes the right to acquire a printing press, or the right to freely practice religion necessarily rests on a right to acquire a sacred text."); *McCoy*, 140 F.4th at 575 ("the parties do not dispute that appellees' intended action—purchasing a handgun for lawful purposes—is part of the 'conduct' protected by the Amendment"). Laws "prohibiting the commercial sale of firearms would be untenable in light of *Heller*." *Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3rd Cir. 2021) (internal citation and quotation marks omitted). See also *Andrews v. State,* 50 Tenn. (3 Heisk) 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them ....").

41.    The right to "keep and bear arms" also protects closely related acts needed to exercise the right itself. See Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 192–94 (2012).  The Second Amendment "'wouldn't mean much' without the ability to acquire arms." *Nguyen v. Bonta*, 140 F.4th 1237, 1241 (9th Cir. 2025), quoting *Teixeira v. County of Alameda,* 873 F.3d 670, 677 (9th Cir. 2017) (en banc); *B&L Prods., Inc. v. Newsom,* 104 F.4th 108, 118 (9th Cir. 2024) ("[U]nless the right to acquire firearms receives some Second Amendment protection, the right to keep and bear firearms would be meaningless."); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective.").

42.    If the government's restriction implicates the right to keep and bear arms, then it is the State's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. If the government "regulates arms-bearing conduct, it bears the burden to justify its regulation." *United*

*States v. Rahimi*, 602 U.S. 680, 691 (2024). See also *Bruen*, 597 U.S. at 33-34 ("the burden falls on respondents to show that New York's proper cause requirement is consistent with this Nation's historical tradition of firearm regulation"). *Cf. Carey v. Population Services International*, 431 U.S. 678, 687–88 (1977) (noting that the right to choose contraception requires the ability to purchase contraception). In performing this historical inquiry, courts may not engage in a "ahistorical and 'judge-empowering interest-balancing inquiry.'" *Wolford*, slip. at 5, quoting *Heller*, 554 U.S. at 634 (internal quotes omitted). See also *Bruen*, 597 U.S. at 22.

43.     At Step Two of the *Bruen* analysis, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 692. See also *Hemani,* 2026 WL 1751710 at *10 ("'Even when a law regulates arms-bearing for a permissible reason,' we have said, 'it may not be compatible with the [Second Amendment] if it does so to an extent beyond what was done at the founding.'"), quoting *Rahimi*, 602 U. S. at 692. "Why and how the regulation burdens the right are central to this inquiry." *Id.* "If the State fails to meet its burden, then the State's restriction must be enjoined. "[W]hen the government crosses the line from permissible regulation into unconstitutional infringement, courts have a duty to say so in the cases before them—no less in the Second Amendment context than in any other." *Hemani,* 2026 WL 1751710 at *10.

44.     *Bruen* further establishes several requirements to determine whether a historical regulation is sufficiently analogous. "'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 597 U.S. at 34, quoting *Heller*, 554 U.S. 634-35. 20th century and late 19th century statutes and regulations "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*,

597 U.S. 66 & n.28. "'[P]ost-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Bruen*, 597 U.S. at 29, quoting *Heller v. District of Columbia*, 670 F.3d , 670 F.3d 1224, 1274 n.6 (Kavanaugh, J., dissenting). See also *Hemani*, 2026 WL 1751710 at *7 (a historical law must have been "focused on protecting the public" in the same concrete sense as the challenged restriction).

45.    Restrictions on the right to keep and bear arms dating from after the Civil War and after the adoption of the Fourteenth Amendment in 1868 may be confirmatory of earlier legislation but cannot be used alone to provide the appropriate historical analogue required by *Bruen*. Only those restrictions with roots in the Founding are sufficiently "enduring" and "well-established" to comport with the Second Amendment's "unqualified command." *Bruen,* 597 U.S. at 24, quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). See also *Hemani*, 2026 WL 1751710 at *5 ("the more a modern law diverges from traditional laws in purpose and operation, the less likely it is to survive review"); *Wolford*, slip op. at 8 ("acceptance [of a restriction] may be express, as when judicial decisions explicitly acknowledged the rule's legality. Or the acceptance may be tacit, as when a restriction on the keeping or carrying of arms was "open, widespread, and unchallenged."), quoting *Bruen*, 597 U.S. at 36. Any historical analogue must be "a well-established and representative." *Bruen,* 597 U.S. at 30.  Historical "outlier" requirements of a few jurisdictions or of the Territories are to be disregarded. *Bruen*, 597 U.S. at 30, 55 n.22, 65. "An outlier legal rule adopted in a few locales is not enough." *Wolford*, slip op. 18-19. See also *Wolford*, slip op. at 23 ("a lone statute adopted nearly a century after the adoption of the Second Amendment and well after the adoption of the Fourteenth Amendment sheds little if any light on the meaning of the Second Amendment right"): *Id*. (a statute that "was neither widespread nor widely accepted … carries no

weight"). Late 19th Century and early 20th Century analogues are too late to inform the required analysis under the Second Amendment. See *Bruen,* 597 U.S. at 66 n.28; *Wolford,* slip op. at 23.

46. The historical analogue must be "relevantly similar," which is to say that it must burden ordinary, law-abiding citizens' right to carry in a similar manner and for similar reasons. *Bruen,* 597 U.S. at 28-29. This inquiry into whether a proper analogue exists is controlled by two "metrics" of "how and why" any restriction was historically imposed during the Founding era. *Bruen,* 597 U.S. at 29. *Wolford*, slip op. at 8 ("Determining whether this condition is met requires consideration of 'how' the analogue restricted the keeping or bearing of arms—that is, whether it imposed a restriction similar to that imposed by the challenged law. And a court must also consider 'why' the analogue restricted the keeping or bearing of arms—that is, whether its rationale was similar to that of the new law."). Courts must assess "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* "[T]he relevant question under *Bruen* . . . is not simply whether two laws targeted similar conduct. It is instead *why* they targeted that conduct—that is, what 'reason' justified the restriction." *Wolford*, slip op. at 13 n.9 (Barrett, J., concurring). See also *Rahimi*, 602 U.S. at 681 ("Why and how the regulation burdens the right are central to this inquiry.").

47. Courts must assess "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Wolford*, slip op. at 8. In cases where "the modern law addresses a situation that could not have arisen when the Second or Fourteenth Amendment was adopted," "it is too much to demand a close match." *Id.* But even in such cases, "the 'how' and 'why' of the historical analogue and modern regulation must be close enough to enable a court to say: 'Because this historical law was understood to be compatible with the right codified by the Second Amendment, we can infer that the restriction

imposed by the modern law is likewise consistent with that right.'" *Id*. In such instances, "application of step two of the *Bruen* framework called for" analogues that "were sufficiently similar to support the provision's constitutionality because the challenged regulation was 'consistent with the principles that underpin our regulatory tradition.'" *Wolford*, slip op. at 9, quoting *Rahimi,* 602 U.S. at 698-99.

48.     The historical analysis required by the Second Amendment is fundamentally a legal inquiry that examines legal history, which is appropriately presented in briefs. See *Bruen*, 597 U.S. at 25 n.6 (noting that the historical inquiry presents "*legal* questions" that judges can address) (emphasis in original). See also *id*. at 33 n.8 (rejecting the dissent's suggestion that further fact-finding was needed and holding that its ruling did not "depend on any of the factual issues raised by the dissent"). The historical inquiry required by *Bruen* is a matter of legislative facts and poses questions of constitutional law for the Court. See, e.g., *Nathan v. Alamo Heights Independent School District,* 173 F.4th 576, 607-08 & n.57 (5th Cir. 2026) (collecting authorities). Expert testimony on such matters is neither appropriate nor probative. *Id*. Accordingly, the required analysis does not require fact-finding by a court or opinion testimony of expert witnesses.

## COUNT I

### SB 334 Violates the Second Amendment

49.     Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Complaint. This Count addresses violations of the Second Amendment to the United States Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For purposes of this

Count, each of the Defendants has acted under "color of state law" within the meaning of Section 1983.

50.    The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." "'[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.'" *Id.* at 28, quoting *Heller* 554 U.S. at 582. Factory stock Glock pistols and Glock clone pistols with a cruciform trigger bar "constitute bearable arms." That factory stock Glock pistols or semiautomatic pistols in general did not exist at the Founding is irrelevant. The plain text of the Second Amendment thus protects "what petitioners want to do," *Wolford,* slip op. at 13, *viz.,* acquire, sell, offer for sale, purchase or transfer, after January 1, 2027, a factory stock Glock handgun or a Glock clone handgun with a cruciform trigger bar.

51.    As a matter of law, handguns are weapons "'in common use' today for self-defense." *Bruen*, 597 U.S. at 32, quoting *Heller*, 554 U.S. at 627. See also *Rahimi,* 602 U.S. at 735. An arm is not "in common use" only if it is both dangerous and unusual as a matter of history and tradition. See *United States v. Bridges*, 150 F.4th 517, 525 (6th Cir. 2025). At the *Bruen* Step One "stage … the question is simply whether a challenged law falls within the Second Amendment's 'plain text.'" *Wolford*, slip op. at 16, quoting *Bruen*, 597 U. S. at 24. A "law . . . clashes with the 'plain text' of the Amendment's language" if it "concern[s] any form of 'Arms' *i.e.,* any weapon customarily used for offensive or defensive purposes." *Wolford*, slip op. at 7.

52.    Factory stock Glock pistols and Glock clone pistols with a cruciform trigger bar are protected "arms" under the Second Amendment and are weapons in common use for lawful purposes. Factory stock Glock pistols are among the most popular handguns in the nation. See How

Glock became America's gun, CBS NEWS (Sep.15, 2013), https://perma.cc/4MES-VBX7. Three Glock handgun models made the top 25 for new guns sold in 2024, placing fourth, seventh, and twenty-second. See Logan Metesh, Top Selling New Guns of 2024, GUNS & AMMO (Jan. 14, 2025), https://perma.cc/8A5Z-5VQN. Analysts estimate that, as of 2020, Glock held nearly 65% of the U.S. market for handguns. Gaston Glock & family, Forbes (Apr. 5, 2021), https://perma.cc/6HWX-6FFP. Glock pistols consistently rank among the top-selling firearms in the U.S. civilian market. See, e.g., Best-Selling Guns, Guns.com (May 5, 2026), https://perma.cc/9JGJ-ZXXN (listing two Glock models in the top-five-selling handguns).

53.     Government data confirms the popularity of these types of handguns. The federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has observed that Glocks are "popular for civilian use." See Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652, 24655 (Apr. 26, 2022). In 2021, Glock manufactured 581,944 handguns in the United States. See ATF Annual Firearms Manufacturing and Export Report at 13 (2021), https://perma.cc/T6FB-YCAY. Of those, just 67,106 were exported. Id. at 153. In 2021, 5,263,341 handguns were imported into the United States. See ATF Firearms Commerce in the United States at 3 (2024), https://perma.cc/P689-LX24. Moreover, in 2021, 5,263,341 handguns were imported into the United States. See Firearms Commerce in the United States at 3, ATF (2024), https://perma.cc/P689-LX24. Of those, 1,688,941 (nearly one-third of the total) were imported from Austria, id. at 5, where many Glocks are manufactured. See Glock, Glock Brand, https://perma.cc/2UWY-EARR ("our complete line of GLOCK pistols has become the choice for millions who aspire to carry the perfect firearm for the mission at hand"). It is therefore likely that, in 2021 alone, Glock imported hundreds of thousands of handguns for sale in the United States.

26

54.     Under federal and State law, firearms may be acquired from or through manufacturers and federally licensed dealers. Firearms may also be legally acquired in private, secondary sales between individuals or via gifts. See MD Code, Public Safety, § 5-124; MD Code, Public Safety, § 5-136. The Second Amendment rights of Marylanders include the right to purchase, acquire, transfer, sell or receive "common use" firearms and that includes factory stock Glock pistols and Glock clones with a cruciform trigger bar. The plain text of the Second Amendment necessarily includes these rights because without these rights, the right to keep and bear handguns, as recognized in *Heller, Bruen*, *Rahimi*, *Hemani* and *Wolford*, would be illusory and meaningless.

55.     "[T[he Second Amendment 'codified a pre-existing right.'" *Wolford,* slip op. at 4, quoting *Heller,* 554 U.S. at 592. "*Heller* instructed courts to ascertain the scope of the right by looking to history." *Wolford*, slip op. at 4. Accordingly, the scope of common law duties and responsibilities with respect to firearms at the Founding is relevant with respect to the meaning and scope of the protections codified in the Second Amendment. See *Bruen*, 597 U. S., at 39 ("'[T]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument was framed and adopted*'") (emphasis the Court's); *Rahimi,* 602 U.S. at 697 (relying on "the ancient common-law prohibition on affrays"); *Wolford*, slip op. at 10, 13 (relying on the common law of trespass at the Founding to invalidate an Hawaii law presumptively banning permit holders from carrying at private property held open to the public); *McCoy,* 140 F.4th at 574-75 ("If a founding-era practice stemmed from a 'long, unbroken line of common-law precedent,' that is strong evidence that the practice was part of a deeply rooted tradition and thus a 'part of our law.'"), quoting *Bruen*, 597 U.S. at 35.

56.     The sale, purchase, offer for sale, receipt and transfer of a handgun, as regulated by SB 334, is all conduct "that could have occurred when the Second and Fourteenth Amendments were adopted." *Wolford*, slip op. at 9. Accordingly, the "how" inquiry mandated by *Bruen* requires that government prove well-established and representative analogue restrictions "similar to that imposed by the challenged law." *Id*., slip op. at 8. The "why" inquiry mandated by *Bruen* in such circumstances requires that government prove well-established and representative analogue restrictions whose "rationale was similar to that of the new law." *Id.* SB 334 fails to satisfy the "how" inquiry because there is no historical analogue from a relevant time period imposing bans "similar to that imposed by" SB 334. SB 334 fails the "why" inquiry because there is no historical analogue from a relevant time period whose "rationale was similar" to SB 334. Defendants will thus be unable to carry their burden under Step Two of *Bruen*.

57.     There is no well-established, representative, historical support from the Founding or any other era, supporting the imposition of bans on the sale, purchase, offer for sale or transfer of firearms, including handguns. In particular, there is no well-established, representative, historical support, from the Founding or any other era, supporting the imposition of bans on the sale, purchase, offer for sale or transfer of firearms, including handguns, because a criminal may be able to illegally readily convert a lawful firearm in common use for lawful purposes into a firearm that is dangerous and unusual. That a handgun can be illegally converted by criminals into a dangerous and unusual firearm does not convert the original handgun into a dangerous and unusual firearm. A factory stock shotgun with a barrel of 18 inches or longer is not and never has been banned merely because the barrel can be readily shortened to less than 18 inches with a common hacksaw, thereby converting the shotgun into an illegal and dangerous and unusual

28

short-barrel shotgun banned by the National Firearms Act under U.S.C. §§ 5845(a), 5861(d). See *Heller*, 554 U.S. at 621-23 (distinguishing *United States v. Miller*, 307 U.S. 174, 179 (1939)).

58.    There is no historical analogue or tradition in either the Founding era or the Reconstruction era that imposed a duty on manufacturers and sellers to protect the public "from the adverse effects" associated with the "diversion, misuse, or abuse" of firearms or other lawful product. *Express Scripts, Inc. v. Anne Arundel County*, 493 Md. 329, 417 (2026) (collecting case law). There is no national "regulatory tradition," *Rahimi,* 602 U.S. at 698, or "historical understanding," *Wolford*, slip op. at 16, of the Second Amendment that can serve as an analogue for the banning of the sale, purchase, transfer, receipt or manufacture of otherwise lawful firearms based on a criminal "diversion, misuse, or abuse" of a firearm. At common law, manufacturers and sellers were not and are not responsible for the criminal "misuse, diversion or abuse" of a firearm or other lawful product. Defendants will thus be unable to carry their burden under Step Two of *Buren*.

59.    There is no historical analogue or tradition in either the Founding era or the Reconstruction era that imposed a duty on manufacturers and sellers of firearms to protect the public "against the actions of third parties." *Valentine v. On Target, Inc.*, 353 Md. 544, 553 (1999). "When the harm is caused by a third party, rather than the first person, … our inquiry is not whether the harm was foreseeable, but, rather, whether the person or entity sued had control over the conduct of the third party who caused the harm by virtue of some special relationship." *Warr v. JMGM Group, LLC*, 433 Md. 170, 184 (2013). See also *Mayor & City Council of Baltimore v. B.P.P.L.C.*, 493 Md. 427, 505-06 (2026) (same); Restatement of Torts (Second) § 315 (1965) (no duty to control third person's conduct so as to prevent physical harm to another unless a special relation exists between actor and third person, or between actor and the other).

29

There is, accordingly, no national "regulatory tradition," *Rahimi,* 602 U.S. at 698, or "historical understanding," *Wolford,* slip op. at 16, of the Second Amendment that can serve as an analogue for the banning of the sale, offer for sale, purchase, transfer, receipt of firearms based on the actions or harm caused by third parties over whom the manufacturers or sellers had no control and with whom manufacturers or sellers have no special relationship. Defendants will thus be unable to carry their burden under Step Two of *Bruen*.

60.     All models of factory stock Glock pistols and other factory stock pistols with a cruciform trigger bar are lawful products. These pistols are currently listed on the Maryland Handgun Roster and thus are currently available for sale in Maryland, except for Glock "Gen 6" models which have been approved by the Roster Board and will be available for sale on or about July 26, 2026. In allowing the sale of these pistols, the Maryland Roster Board has found that these pistols "are useful for legitimate sporting, self-protection, or law enforcement purposes." MD Code, Public Safety, § 5-405(a)(1). These findings by the Roster Board establish that these pistols are in common use for lawful purposes. The January 1, 2027, bans imposed by SB 334 are based solely on such "diversion, misuse, or abuse" by criminals of factory stock Glock pistols and/or of other factory stock pistols with a cruciform trigger bar. The manufacturers or sellers of these pistols have never owed a common law duty to the public to prevent such diversion, misuse, or abuse of firearms by third parties over whom the manufacturers or sellers of firearms had no control and with whom the manufacturers or sellers of firearms had no special relationship. Defendants will thus be unable to carry their burden under Step Two of *Bruen*.

61.     Plaintiffs do not dispute that the State may ban the illegal conversion of handguns into machine guns by criminals using illegal switches. Both Maryland and the federal government have already banned the possession and manufacture of switches and such

conversions. Plaintiffs do not challenge such bans. However, there is no national "regulatory tradition," *Rahimi*, 602 U.S. at 698, or "historical understanding," *Wolford*, slip op. at 16, of the Second Amendment that can serve as an analogue for the bans imposed by SB 334 on an unconverted handgun that is in common use for lawful purposes by law-abiding Americans. Defendants will thus be unable to carry their burden under Step Two of *Bruen*.

62.     In banning the manufacture, sale, offer for sale, purchase, receipt, or transfer of factory stock Glock pistols or Glock clones with a cruciform trigger bar, SB 334 violates the Second Amendment to the United States Constitution, both facially and as applied to the named plaintiffs and to members of MSI. *See Citizens United v. FCC*, 558 U.S. 310, 331 (2010) ("the distinction between facial and as-applied challenges" merely "goes to the breadth of the remedy employed by the Court, not what must be pleaded"). "[W]hen the government crosses the line from permissible regulation into unconstitutional infringement, courts have a duty to say so in the cases before them—no less in the Second Amendment context than in any other." *Hemani*, 2026 WL 1751710 at *5.

                                    **PRAYER FOR RELIEF**

   **WHEREFORE,** the Plaintiffs respectfully request:

   A. That this Court issue a declaratory judgment declaring that the bans imposed by SB 334 are facially unconstitutional under the Second Amendment in so far as SB 334 prohibits the sale, the offer for sale, the purchase, transfer or the receipt of factory stock Glock pistols and Glock clone pistols with a cruciform trigger bar;

   B. That this Court issue a declaratory judgment declaring that the bans imposed by SB 334 are unconstitutional under the Second Amendment, as applied to plaintiffs, in so far as SB

31

334 prohibits the sale, the offer for sale, the purchase, transfer or the receipt of factory stock Glock pistols and Glock clone pistols with a cruciform trigger bar;

C.  That this Court and preliminarily and permanently enjoin defendants from enforcing SB 334 in so far as SB 334 prohibits the sale, the offer for sale, the purchase, transfer or the receipt of factory stock Glock pistols and Glock clone pistols with a cruciform trigger bar;

D. That this Court award attorneys' fees and costs against defendants, as authorized by 42 U.S.C. § 1988;

E. That this Court award the Plaintiffs such other and further relief as in law and justice they may be entitled to receive.

Respectfully submitted,

*/s/ Mark W. Pennak*

Mark W. Pennak
MARYLAND SHALL ISSUE, INC.
9613 Harford Rd
Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
District Court Bar # 21033

Matthew Larosiere*
6964 Houlton Cir
Lake Worth FL 33467
Larosieremm@gmail.com

*Application for admission to the Bar of this Court pending.

Dated: July 2, 2026                    *Counsel for Plaintiffs*