**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| FRANCIS M. DUFFY, Ph.D *et al.*,<br><br>    *Plaintiffs*,<br><br><br>WESTLEY MOORE, in his official capacity as Governor of Maryland, *et al.*,<br><br>    *Defendants.* | Case No. 1:26-cv-2647 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

Matthew Larosiere*
6964 Houlton Cir.
Lake Worth FL 33467
Larosieremm@gmail.com
*Bar application pending


Dated: July 13, 2026

Mark W. Pennak
MARYLAND SHALL ISSUE, INC.
9613 Harford Rd, Ste C #1015
Baltimore, MD 21234-21502
 mpennak@marylandshallissue.org
 Phone: (301) 873-3671
 District Court Bar # 21033
*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

STATEMENT OF THE CASE..................................................................................................1

    A.  The Regulatory Scheme ........................................................................................1

    B.  Statement of Facts................................................................................................4

        1.  The Plaintiffs.................................................................................................4

        2.  The Defendants .............................................................................................9

        3.  Glocks and other pistols with a cruciform trigger bar .................................10

ARGUMENT .......................................................................................................................12

I.     STANDARD FOR A PRELIMINARY INJUNCTION.......................................................12

II.    PLAINTIFFS HAVE STANDING ...................................................................................13

III.   PISTOLS WITH A CRUCIFORM TRIGGER BAR
       ARE "ARMS" UNDER *BRUEN'S* STEP ONE................................................................14

IV.   SB 334'S BANS ON PISTOLS WITH A CRUCIFORM TRIGGER BAR
       FAIL AT *BRUEN*'S STEP TWO .......................................................................................18

  A.  Firearms In Common Use For Lawful Purposes Cannot Be Banned ............................18

    B.  The Historical Inquiry Under *Bruen'*s Step Two.................................................20

    C.  The State Cannot Carry Its Burden At Step Two Of Bruen .............................................23

        1.  SB 334 fails the "how" and "why" inquiries ...............................................23

        2.  SB 334 is not supported by the common law .............................................26

IV.   THE VIOLATION OF PLAINTIFFS' SECOND AMENDMENT
       RIGHTS CAUSES IRREPARABLE HARM ........................................................................28

VI.   THE OTHER FACTORS WEIGH IN FAVOR
      OF A PRELIMINARY INJUNCTION ............................................................................29

CONCLUSION ....................................................................................................................29

**TABLE OF AUTHORITIES**

**Cases:**

*AAR v. Hudson* 144 F.4th 582 (4th Cir. 2025)................................................................14

*B&L Prods., Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024) .......................................17

*Bianchi v. Brown*, 111 F.4th 438 (4th 2024) (en banc)...............................................18

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ........................................................14

Caplin & Drysdale, Chartered v. United States, 491 U.S.617 (1989) ........................28

*City of Chicago v. Beretta U.S.A. Corp.*, 290 Ill.Dec. 525, 821 N.E.2d 1099 (2004)................27

*Di Base v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017) ....................................................13

*Dist. of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633 (D.C. 2005) (en banc)....................27

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................................*passim*

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3rd Cir. 2021)............................................16

*Express Scripts, Inc. v. Anne Arundel Co.*, 493 Md. 329 (2026)................................26

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)................................................17

*Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023)..........................................................16

*Georgia v. Pres. of the United States*, 46 F.4th 1283 (11th Cir. 2022) .....................29

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002)...............................29

*Hafer v. Melo*, 502 U.S. 21 (1991) ..............................................................................29

*Heller v. District of Columbia*, 670 F.3d 1224 (D.C. Cir. 2012)....................................21

*Hunt v. Wash. State Apple Ad. Comm'n,* 432 U.S. 333 (1977) ....................................14

*In re Special Investigation No. 244*, 296 Md. 80, 459 A.2d 1111 (Md. 1983)...............10

*Johnson & Johnson v. Samsung Bioepis Co. Ltd.*, 173 F.4th 454 (3d Cir. 2026) ........29

*Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018)............................................................13

*Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026)..................................................................13

*Kipke v. Moore*, 695 F.Supp.3d 638, 662 (D.Md. 2023),
 *aff'd in part,* 165 F.4th 194 (4th Cir. 2026).................................................................28, 29

*Legend Night Club v. Miller*, 637 F.3d 291(4th Cir. 2011) .........................................29

*Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199 (4th Cir. 2020)....................... 7, 8, 13

*Mayor & City Council of Baltimore v. BPPLC*, 493 Md. 427 (2026) .........................27

*McCoy v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
 140 F.4th 568 (4th Cir. 2025), *cert. denied,* 2026 WL 1871297 (U.S. June 30, 2026) ................15

*McDonald v. City of Chicago*, 561 U.S. 742 (2010).....................................................14

*Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022) ......................................................28

*Nathan v. Alamo Heights Indep. School District*, 173 F.4th 576 (5th Cir. 2026) ..........................23

*New York State Rifle & Pistol Ass'n. v. Bruen*, 597 U.S. 1, 28 (2022)...................................*passim*

*Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025) .........................................................17

*Nunn v. State*, 1 Ga. 243 (1846) ...................................................................................15

*Ortega v. Grisham*, 148 F.4th 1134 (10th Cir. 2025).....................................................16

*People ex rel. Spitzer v. Sturm, Ruger & Co.*, 309 A.D.2d 91,
 761 N.Y.S.2d 192 (App. Div. 2003).............................................................................27

*Reese v. BATF*, 127 F.4th 583 (5th Cir. 2025)...............................................................16

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) .....................................................29

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020)...............................28

*Ross v. Meese*, 818 F.2d 1132 (4th Cir. 1987)...............................................................28

*Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023) ...........................................................18

S*mith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025) ..................27

*St. Michael's Media,Inc. v. Mayor & City Council of Baltimore*,
 566 F.Supp.3d 327 (D. Md. 2021)................................................................................13

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ............................................13

iv

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc)......................................17

*United States v. Hemani*, 146 S.Ct. 1677 (2026) ......................................................*passim*

*United States v. Knipp*, 138 F.4th 429, 434 (6th Cir. 2025) ........................................16

*United States v. Price*, 111 F.4th 392 (4th Cir. 2024) (en banc),
 *cert. denied*, 145 S.Ct. 1891 (2025) .....................................................................18

*United States v. Rahimi,* 602 U.S. 680 (2024) .....................................................*passim*

*Valentine v. On Target, Inc*., 353 Md. 544, 553 (1999)..............................................27

*Viramontes v. Cook Co.*, No. 25-238, *cert granted,* 2026 WL 1871322 (U.S. June 30, 2026)..24

*Warr v. JMGM Group, LLC*, 433 Md. 170 (2013). .....................................................27

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 70 (2008)...........................................12

*Wolford v. Lopez*, No. 24–1046, 609 U.S. ---, ---- S.Ct. ----,
 2026 WL 1825723 (U.S. June 25, 2026) ..............................................................*passim*

**Federal Statutes:**

15 U.S.C. § 7901(a)(3)...............................................................................................27

15 U.S.C. § 7901(a)(7)...............................................................................................27

18 U.S.C. § 922(a)(1).................................................................................................11

18 U.S.C. § 922(k) .....................................................................................................24

18 U.S.C. § 923 ......................................................................................................6, 7

26 U.S.C. § 5861....................................................................................................3, 11

26 U.S.C. § 5845(a) ...................................................................................................26

26 U.S.C. § 5861(d) ...................................................................................................26

26 U.S.C. § 5871..........................................................................................................3

28 U.S.C. § 922(o).................................................................................................2, 11

28 U.S.C. § 924(a)(2)..................................................................................................3

**State Statutes:**

2026 Maryland Session Laws, Ch. 771 (SB 334)................................................................*passim*

MD Code Public Safety, § 5-124(a)(1),(2) ........................................................................ 1

MD Code, Criminal Law, § 4-301(h).................................................................................. 2

MD Code, Criminal Law, § 4-301(m)(2) ............................................................................ 2

MD Code, Criminal Law, § 4-301(o)(1) ............................................................................ 2

MD Code, Criminal Law, § 4-301(o)(3).............................................................................. 26

MD Code, Criminal Law, § 4-305.2.......................................................................... 1, 3, 10, 12

MD Code, Criminal Law, §§ 4-301 and 4-302, ................................................................... 1

MD Code, Criminal Law, §§ 4-302(o) ................................................................................ 26

MD Code, Public Safety, § 5-101(q)................................................................................ 5, 6

MD Code, Public Safety, § 5-106 ...................................................................................... 6, 7

MD Code, Public Safety, § 5-117.1 .................................................................................... 4, 5

MD Code, Public Safety, § 5-117.1(a)(3)............................................................................ 5

MD Code, Public Safety, § 5-129 ...................................................................................... 4, 5

MD Code, Public Safety, § 5-145 ...................................................................................... 10

MD Code, Public Safety, § 5-404 ...................................................................................... 3

MD Code, Public Safety, § 5-405 ............................................................................ 3, 19, 24, 25

MD Code, Public Safety, § 5-406(a)(2)............................................................................... 3

MD Code, Public Safety, §§ 5-405(b)(4),(5),(6) & (9)...................................................... 3

**Other Authorities:**

ATF Annual Firearms Manufacturing and Export Report at 13 (2021) .........................................20

ATF Firearms Commerce in the United States at 3 (2024)...........................................................20

**Treatises:**

A Wright & Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2022).............................28

Antonin Scalia & Bryan A. Garner, *Reading Law:*

 *The Interpretation of Legal Texts* (2012)....................................................................................16

**Regulations:**

7 Fed. Reg. 24652, 24655 (Apr. 26, 2022) ...................................................................................20

**Constitutional Provisions:**

U.S. Constitution, Amend. 2 .................................................................................................*passim*

Maryland Const. art V, § 3 ..........................................................................................................10

On, April 10, 2026, the General Assembly of Maryland enacted Senate Bill 334 ("SB 334" or "the Bill"), and defendant Governor Westley Moore, signed SB 334 into law on May 26, 2026. 2026 Maryland Session Laws, Ch. 771. Effective October 1, 2026, SB 334 amends MD Code, Criminal Law, §§ 4-301 and 4-302, and creates a new section, MD Code, Criminal Law, § 4-305.2, which provides that "[o]n or after January 1, 2027, a person may not . . . sell, offer for sale, purchase, receive, or transfer a machine gun convertible pistol." This Court should declare that SB 334 violates the Second Amendment of the United States Constitution and enter a preliminary injunction enjoining enforcement of these bans imposed by SB 334.

## STATEMENT OF THE CASE

### A.    The Regulatory Scheme

This suit challenges Senate Bill 334, 2026 Maryland Session Laws, Ch. 771, which was signed into law by Defendant Governor Westley Moore on May 26, 2026. As enacted, SB 334 amends MD Code, Criminal Law, §§ 4-301, 4-302, and creates a new section in the Maryland Criminal Code, Section 4-305.2, which provides (with few exceptions not relevant here) that "on or after January 1, 2027, a person may not manufacture, sell, offer for sale, purchase, receive, or transfer a machine gun convertible pistol." MD Code, Criminal Law, § 4-305.2(a). SB 334 bans acquisitions, sales, transfers, purchases, receipts and offers for sale of convertible pistols, regardless of whether these activities take place through a dealer or through non-dealer private transactions, as otherwise permitted by MD Code Public Safety, § 5-124(a)(1),(2). A first offense of any of these prohibitions is punishable under MD Code, Criminal Law, § 4-306(a), by "imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both." Conviction of this offense would impose a lifetime firearms disability under MD Code, Public Safety, § 5-101(g)(3), and under 18 U.S.C. § 921(a)(20), and 18 U.S.C. § 922(g)(1).

SB 334 defines a "machine gun convertible pistol" to mean "any semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or by using common household tools into a machine gun by the installation or attachment of a pistol converter as a replacement for the slide's backplate." MD Code, Criminal Law, § 4-301(o)(1). "Common household tool" is defined to include "a screwdriver, a pipe wrench, pliers, a hacksaw, a crowbar, an electric drill, a rotary tool, a hammer, a chisel, a file, and a crescent wrench." MD Code, Criminal Law, § 4-301(h). SB 334 defines a "cruciform trigger bar" to mean a component in a semiautomatic pistol that: "(1) serves as a link between the trigger and the firing pin; and (2) has its sear incorporated into a cross–shaped surface." *Id*. at § 4-301(j). SB 334 defines a "pistol converter" to mean "any device or instrument that, when installed in or attached to the rear of the slide of a semiautomatic pistol, replaces the backplate and interferes with the trigger mechanism, which enables the pistol to shoot automatically more than one shot by a single function of the trigger." *Id.* at § 4-301(p)(1). The definition for a "pistol converter" encompasses what are commonly termed "switches" or "auto-sears" (collectively "switches" or "switch"). *Id.*, at § 4-301(r). As amended by SB 334, Maryland law classifies such a "pistol converter" or switch as a "rapid fire activator." MD Code, Criminal Law, § 4-301(m)(2).

Maryland law prohibits the transport of any "rapid fire activator" and further provides that a person may not "manufacture, possess, sell, offer to sell, transfer, purchase, or receive a rapid fire activator." MD Code, Criminal Law, § 4-305.1(a). A violation of this provision is a misdemeanor and punishable by "imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both." MD Code, Criminal Law, § 4-306(a). A "switch" also falls within the definition of a "machinegun" under federal law. 26 U.S.C. § 5845(b); 18 U.S.C. § 922(o). See, e.g., *United States v. Cash*, 149 F.3d 706, 707 (7th Cir. 1998) (noting "auto sears are treated as machine guns"); *United States v. Brown,* 147 F.4th 687, 688 n.1 (6th Cir. 2025) (charged with possession of a Glock switch "which neither party contests is a machinegun"). With exceptions not relevant here, it is a federal felony

to possess, manufacture, transfer or receive a machinegun under federal law. 28 U.S.C. § 922(o); 26 U.S.C. § 5861. A knowing violation of Section 922(o) is punishable by imprisonment by not more than 10 years. 28 U.S.C. § 924(a)(2). A violation of Section 5861 is punishable by a fine of $250,000, or by imprisonment for 10 years, or both. 26 U.S.C. § 5871.

SB 334 further provides that a "machine gun convertible pistol" "does not include a hammer–fired semiautomatic pistol or a striker–fired semiautomatic pistol without a cruciform trigger bar." MD Code, Criminal Law, § 4-301(o)(3). SB 334 instructs the Maryland State Police to "adopt regulations to implement this section, including publishing a list of prohibited machine gun convertible pistols." MD Code, Criminal Law, § 4-305.2(b). As of the date of the Complaint, the Maryland State Police had not yet published any such list. SB 334 permits "the temporary gratuitous exchange of a machine gun convertible pistol." *Id*. at 4-302(13).

Maryland law conditions the sale of a handgun in Maryland on the prior approval of the handgun by the Handgun Roster Board ("Roster Board"), which is part of the Department of the Maryland State Police. MD Code, Public Safety, § 5-404. MD Code, Public Safety, § 5-406(a)(2) provides that "[a] person may not sell or offer for sale in the State a handgun manufactured after January 1, 1985, that is not included on the handgun roster." The Roster Board is charged with, *inter alia*, the duty "to (1) compile and maintain a handgun roster of authorized handguns that are useful for legitimate sporting, self-protection, or law enforcement purposes," MD Code, Public Safety, § 5-405. Approval for the sale of a pistol can only take place after the Board has considered several factors, including "quality of materials," "quality of manufacture," "reliability as to safety" and "utility for legitimate sporting activities, self-protection, or law enforcement." MD Code, Public Safety, §§ 5-405(b)(4),(5),(6) & (9).

**B.      Statement of Facts**

**1.      The Plaintiffs**

Plaintiff FRANCIS M. DUFFY, Ph.D., is a Maryland resident and is a member of the Board of Directors of Plaintiff Maryland Shall Issue, Inc. ("MSI"). He is an Army Special Forces veteran, a graduate of the Army Ranger School and was a certified Special Forces Combat Diver. He also is a "qualified handgun instructor" under MD Code Public Safety, § 5-101(q), and a handgun instructor certified by the National Rifle Association ("NRA") and the U.S. Concealed Carry Association ("USCCA"). He possesses a valid Handgun Qualification License under MD Code, Public Safety, § 5-117.1, and is entitled to purchase handguns in Maryland. He is also a "designated collector" within the meaning of State law, MD Code, Public Safety, § 5-129, and is thus entitled to purchase more than one handgun during a 30-day period. Duffy Decl. ¶ 4.

Plaintiff Duffy currently owns numerous pistols, including numerous Glock pistols, and regularly uses and temporarily transfers Glock pistols to students during instruction for which he is compensated by students. He principally uses factory stock Glock pistols in that instruction because Glock pistols are reliable and simple to operate for beginners. But for SB 334, he would acquire factory stock Glock pistols either from a State-licensed dealer or on the secondary market after January 1, 2027, but will refrain from doing so because he fears prosecution under SB 334. But for SB 334, he would continue to engage in the temporary transfer of such Glock pistols to students during instruction for which he receives compensation but will refrain from doing so after January 1, 2027, for fear of prosecution under SB 334. SB 334's prohibitions on transfers of Glocks and Glock clones with a cruciform trigger bar will effectively preclude the use of these pistols in instruction for which compensation is received. The bans imposed by SB 334 effectively destroy the market value of these pistols which he already owns. That destruction of the market value of

4

these Glock pistols, the inability to use Glock pistols in paid instruction and the need to purchase replacement pistols will inflict monetary losses and costs on him. *Id.* ¶¶ 5.6.

Plaintiff STANLEY PETER, Jr., is a Maryland resident and retired as an officer from the United States Air Force where he served as a B-52 Navigator. He also is a "qualified handgun instructor" under MD Code, Public Safety, § 5-101(q), and is also certified by the National Rifle Association as a Training Counselor and Chief Range Safety Officer. He is qualified to instruct numerous firearms related courses, such as pistol, rifle, shotgun, range safety, concealed carry and cartridge reloading. As a veteran, he is exempt from needing a Handgun Qualification License under MD Code, Public Safety, § 5-117.1(a)(3), and is legally permitted to purchase handguns in Maryland. He is also a "designated collector" within the meaning of State law, MD Code, Public Safety, § 5-129, and is thus entitled to purchase more than one handgun during a 30-day period. He is a life member of Plaintiff Maryland Shall Issue, Inc. Peter Decl. ¶ 4.

Plaintiff Peter currently owns numerous rifles, shotguns and pistols, including factory stock Glock pistols, and uses and temporarily transfers factory stock Glock pistols to students in and during instruction for which he is compensated by students. From time to time he will sell handguns, including Glock pistols, as permitted by Maryland law, but will refrain from doing so on and after January 1, 2027, because he fears prosecution under SB 334. But for SB 334, he would acquire factory stock Glock pistols either from a State licensed dealer or on the secondary market after January 1, 2027, but will refrain from doing so because he fears prosecution under SB 334. But for SB 334, he would continue to engage in the temporary transfer of such Glock pistols to students during instruction for which he receives compensation but will refrain from doing so after January 1, 2027, for fear of prosecution under SB 334. SB 334's prohibitions on transfers of Glocks and Glock clones with a cruciform trigger bar will preclude the use of these pistols during instruction for which compensation is received. The bans imposed by SB 334 effectively destroy the market

5

value of Glock pistols he already owns. That destruction of the market value of these Glock pistols and the inability to continue to use Glock pistols in paid instruction will inflict monetary losses on him. *Id.* ¶¶ 5,6.

THE MACHINE GUN NEST is a Maryland corporation located on private property within Frederick County, Maryland. Pursuant to 18 U.S.C. § 923, The Machine Gun Nest is a federally licensed firearms dealer at its current location and is also a Maryland State licensed firearms dealer and is thus authorized by State law to engage "in the business of selling, renting or transferring regulated firearms." MD Code, Public Safety, § 5-106. As part of its business, The Machine Gun Nest regularly sells all models of factory stock Glock pistols as well as pistols manufactured by other brands that utilize a cruciform trigger bar, including pistols made by Palmetto State Armory, ZEV Technologies, Shadow Systems, Lone Wolf Arms, and Sturm & Ruger. The Machine Gun Nest is a corporate member of Plaintiff Maryland Shall Issue, Inc. Krop Decl. ¶ 4.

The sale of Glock handguns and other handguns with a cruciform trigger bar make up a significant part of the gross revenue annually of The Machine Gun Nest. Since opening in 2015, The Machine Gun Nest has transferred thousands of Glock pistols, including nearly 500 in the last 18 months alone. The Machine Gun Nest also maintains 48 Glocks and Glock-style handguns in its rental inventory so new shooters can "try before they buy." The Machine Gun Nest range employs multiple full-time Maryland certified instructors under MD Code, Public Safety, § 5-101(q). Glocks are a foundational tool in instruction programs run by The Machine Gun Nest. The Machine Gun Nest currently has nearly 100 classes projected through 2027, all of which incorporate the temporary transfer of factory stock Glock pistols to students. The Machine Gun Nest receives compensation for such instruction. *Id.* ¶5.

But for SB 334, The Machine Gun Nest would continue to receive, offer for sale, purchase, sell and transfer factory stock Glock pistols and other pistols with a cruciform trigger bar after

January 1, 2027, but will refrain from doing so for fear of prosecution under SB 334. But for SB 334, The Machine Gun Nest would continue to engage in the temporary transfer of such Glock pistols to students during instruction for which it receives compensation but will refrain from doing so for fear of prosecution under SB 334. SB 334's prohibitions on the sale, offer for sale, the receipt and on transfers of Glocks and other pistols with a cruciform trigger bar preclude the use of these pistols in instruction and effectively destroys the market value of Glock pistols which are already owned and used by The Machine Gun Nest for instruction. *Id.* ¶ 6.

The prohibitions imposed by SB 334 will adversely affect sales and will cause lost profits from sales that The Machine Gun Nest would have made of these pistols but for the enactment of SB 334. SB 334's prohibitions on the sale, offer for sale, the receipt and on transfers of Glocks and Glock clones with a cruciform trigger bar will effectively destroy the market value of these pistols in the inventory of The Machine Gun Nest after January 1, 2027. The Machine Gun Nest has standing to sue for the harm caused to its own business by SB 334 and has standing to represent the interests of its customers who have a constitutionally protected interest in the acquisition, transfer and sale of Glock pistols and other pistols with a cruciform trigger bar. *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020). Krop Decl. ¶¶ 4,6

ENGAGE ARMAMENT, LLC ("Engage") is a Maryland corporation located on private property within Montgomery County, Maryland. Pursuant to 18 U.S.C. § 923, Engage is a federally licensed Type I dealer (retail dealer) and Type X dealer (manufacturer of destructive devices and ammunition for such devices). See 27 C.F.R. § 478.41 *et seq*. Pursuant to MD Code, Public Safety, § 5-106, Engage is also a Maryland State licensed firearms dealer and is thus authorized by State law to engage "in the business of selling, renting or transferring regulated firearms." As part of its business, Engage regularly sells all models of factory stock Glock pistols as well as pistols manufactured by other brands that utilize a cruciform trigger bar, including pistols made by Palmetto

7

State Armory, ZEV Technologies, Shadow Systems, Lone Wolf Arms, and Sturm & Ruger. The sale of factory stock Glock handguns and other handguns with a cruciform trigger bar makes up approximately 20% of the gross revenue annually of Engage. In the past 18 months Engage has sold or transferred 646 factory stock Glock pistols. Raymond Decl. ¶ 4.

The sale of Glock handguns and other handguns with a cruciform trigger bar make up a significant proportion of the gross revenue annually of Engage. But for SB 334, Engage would continue to receive, offer for sale, purchase, sell and transfer factory stock Glock pistols and other pistols with a cruciform trigger bar after January 1, 2027, but will refrain from doing so for fear of prosecution under SB 334. SB 334's prohibitions on the sale, offer for sale, the receipt and on transfers of Glocks and Glock clones with a cruciform trigger bar will effectively destroy the market value of these pistols in Engage's inventory after January 1, 2027. These prohibitions will cause lost profits from sales that Engage would have made of these pistols but for the enactment of SB 334. Engage has standing to sue for the harm caused to its own business by SB 334 and has standing to represent the interests of its customers who have a constitutionally protected interest in the acquisition, transfer and sale of Glock pistols and Glock clone pistols with a cruciform trigger bar. *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020). Engage is a corporate member of Plaintiff Maryland Shall Issue, Inc. Raymond Decl. ¶ 5.

Plaintiff MARYLAND SHALL ISSUE, INC. ("MSI") is a Maryland corporation. MSI is an Internal Revenue Service Section 501(c)(4), non-profit, non-partisan, all-volunteer membership organization with approximately 2000 members statewide. MSI is dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. The purposes of MSI include promoting the exercise of the right to acquire, keep and bear arms and education, research, and legal action associated with the constitutional right to

privately acquire, own, possess and carry firearms. Each of the named individual plaintiffs and each of the dealer plaintiffs is a member of MSI. Johnston Decl. ¶ 3.

MSI has one or more individual members who live in Maryland and who lawfully own factory stock Glock pistols or Glock clones that are manufactured with "cruciform trigger bars." MSI has one or more members who intend to acquire, sell or transfer factory stock Glock pistols after January 1, 2027, but will refrain from doing so because they reasonably fear prosecution under SB 334 if they do so on or after January 1, 2027. MSI has one or more members who are State certified firearms instructors who use and temporarily transfer factory stock Glock pistols to students in instruction for which they are compensated. One or more of these instructor members intend to acquire, sell or temporarily transfer factory stock Glock pistols on or after January 1, 2027, but will refrain from doing so because they reasonably fear prosecution under SB 334 if they do so on or after January 1, 2027. *Id*. ¶4

MSI brings this action on behalf of its members, including its member instructors and federal and State licensed dealers, who currently own factory stock Glock pistols or other pistols with cruciform trigger bars, who intend to acquire and would acquire Glock pistols or other pistols with cruciform trigger bars after January 1, 2027, but will refrain from doing so because they reasonably fear prosecution under SB 334. MSI has associational standing to represent the interests of its members. The interests of its members are germane to the mission and purpose of MSI and the participation of these members is not necessary or desirable for a full and fair adjudication of the claim and the prayer for relief alleged in the Complaint. *Id.* ¶¶ 5,6.

### 2. The Defendants

The Defendant, WESTLEY MOORE, is the Governor of Maryland and, as head of the executive branch of the State of Maryland, is responsible for the enforcement of State laws and regulations issued by State regulatory agencies, including the Department of the Maryland State

Police. Additionally, as Governor, Defendant Moore may direct the Attorney General to undertake criminal investigations and prosecutions. Md. Const. art V, § 3; *see also In re Special Investigation No. 244*, 296 Md. 80, 459 A.2d 1111, 1115 (Md. 1983). Defendant Moore is sued in his official capacity.

The Defendant MICHAEL A. JACKSON, is the Acting Superintendent of the Maryland State Police, and as such, "enforce[s] the laws and ordinances of the State, counties, and municipal corporation." MD Code, Public Safety § 2-301(a)(2)(iii). Defendant Jackson is also specifically empowered to conduct investigations into the lawfulness of sales of handguns and other regulated firearms by State licensed dealers. MD Code, Public Safety, § 5-145. The Department of the Maryland State Police is under Defendant Jackson's supervision, command and control and is directed by SB 334 to create a list of handguns that are subject to the bans imposed by SB 334. MD Code, Criminal Law, § 4-305.2(b). Defendant Jackson is sued in his official capacity.

### 3.    Glocks and other pistols with a cruciform trigger bar

All factory stock models of Glock pistols are equipped with a "cruciform trigger bar" including the latest models of the Glock pistols, the factory stock "Gen 6" and "V series" Glock pistols that were first distributed by Glock in the United States in late 2025. Raymond Decl. ¶ 6, Monica Decl. ¶¶ 19, 27, 31, 34. The cruciform trigger bar acts as the primary sear, pulling and holding the firing pin back and is an integral part of Glock's SAFE ACTION® System in which the trigger bar interacts with a specially designed safety ramp within the rear trigger mechanism housing. Under that system, the firing pin cannot strike a cartridge unless and until the trigger bar is pulled rearward, which moves the cruciform down the ramp, releasing the sear from the energized firing pin. This system ensures that the pistol cannot go off accidentally or unintentionally if the pistol is dropped while loaded. Raymond Decl. ¶ 6, Monica Decl. ¶¶ 19, 27, 31, 34.

10

Other manufacturers, including but not limited to Palmetto State Armory, ZEV Technologies, Shadow Systems, Lone Wolf Arms, and Sturm & Ruger, likewise make factory stock pistols that make use of a "cruciform trigger bar." Raymond Decl. ¶ 7; Monica Decl. ¶¶ 36, 37. These models of non-Glock pistols with a cruciform trigger bar are commonly and informally called "Glock clones" because they make use of Glock designs, including the design for a cruciform trigger bar, for which Glock's patents have expired. *Id.* Federal law bars the receipt of a handgun by any person who is an out-of-state resident and is not a federally licensed dealer. 18 U.S.C. § 922(a)(1). The individual Plaintiffs thus may not receive a factory stock Glock pistol or Glock clone pistol in another state.

Earlier factory stock models of Glock pistols, including Gen 3, Gen 4 and Gen 5 pistols, and Glock clone pistols with a cruciform trigger bar could be fitted with a "switch" or "auto-sear" or "pistol converter" (collectively "a switch") by illegally modifying the frame of the pistol and by replacing the backplate of the slide with a switch on the rear of the slide of the pistol. These modifications enabled the pistol to shoot automatically more than one shot by a single function of the trigger. Raymond Decl. ¶ 8; Monica Decl. ¶¶ 40-46. These switches are not manufactured by Glock but rather are illegally imported from abroad or manufactured by criminals. *Id.* Any manufacture or possession of such a switch and any possession of any such modified Glock pistol or a Glock clone would constitute a federal felony under 28 U.S.C. § 922(o), and 26 U.S.C. § 5861. The manufacture or possession of a switch or of a Glock pistol or Glock clone modified with a switch would also constitute a misdemeanor violation of MD Code, Criminal Law, § 4-305.1(a).

The latest models of factory stock Glock pistols, the "Gen 6" and "V series" models feature a redesigned frame and rear slide geometry by adding metal ramps around the sear and changes the slide backplate and internal components. Raymond Decl. ¶ 9. These design changes are designed to prevent, and do in fact prevent, the installation of existing "switches." Notwithstanding these design

11

changes, "Gen 6" and "V series" pistol continue to make use of a cruciform trigger bar. *Id.* Accordingly, the Maryland State Police are likely to add factory stock "Gen 6" and "V series" pistols to the list of banned pistols that the State Police are required to publish under SB 334, MD Code, Criminal Law, § 4-305.2(b).

All models of factory stock Glock pistols manufactured by Glock prior to the latest models ("Gen 6" and "V Series" models) have been approved by the Roster Board and are currently listed on the Maryland handgun roster. https://bit.ly/4gWaoH1. See also Raymond Decl. ¶ 10. Glock "V Series" pistols, first distributed by Glock in the United States in late 2025, have also been approved by the Roster Board. *Id.* Glock "Gen 6" pistols were approved by Roster Board on June 3, 2026. *Id.* Numerous "Glock clones" have also been approved by the Roster Board, including pistols manufactured by Palmetto State Armory, ZEV Technologies, Shadow Systems, Lone Wolf Arms, and Sturm & Ruger. *Id.* Factory stock Glocks are "carried by more than 60 percent of law enforcement agencies in the United States" (https://bit.ly/3SMrBsI), including the Maryland State Police (https://bit.ly/4f6xgkC), the Maryland Capitol Police (https://bit.ly/4yaVN0B) and the Baltimore Police Department (https://bit.ly/4y7VNi9) . See also https://bit.ly/4wBfyNx (Maryland Comptroller Field Enforcement Bureau designation of the Glock model 45 9mm handguns as "reliable, accurate, and safe, for use in the performance of duty."). See also Monica Decl. ¶¶ 58-60.

## ARGUMENT

## I.    STANDARD FOR A PRELIMINARY INJUNCTION

A party seeking a preliminary injunction order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). All these elements are satisfied here. "A preliminary injunction is an extraordinary remedy intended to protect the status

quo and prevent irreparable harm during the pendency of a lawsuit." *Di Base v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (collecting case law). "[A] preliminary injunction can also act to restore, rather than merely preserve, the status quo, even when the nonmoving party has disturbed it." *Id.* at 231. This motion seeks to maintain the *status quo ante* pending a final judgment. The element of a likelihood of success "does not require a 'certainty of success,'" but rather only that "the plaintiff 'must make a clear showing that he is likely to succeed at trial.'" *St. Michael's Media,Inc. v. Mayor & City Council of Baltimore*, 566 F.Supp.3d 327, 351 (D. Md. 2021), quoting *Di Biase*, 872 F.3d at 230. That standard is satisfied here because the bans imposed by SB 334 clearly infringe the Second Amendment rights of each of the plaintiffs and are thus unconstitutional. As detailed below, the other elements for a preliminary injunction are likewise satisfied.

## II.    PLAINTIFFS HAVE STANDING

Each of the individual and dealer plaintiffs has an "intent to engage in conduct proscribed by the statute" and thus has standing to bring this suit. *Kipke v. Moore*, 165 F.4th 194, 212-13 (4th Cir. 2026). See Duffy Decl. ¶¶ 5,6; Peter Decl. ¶¶ 5,6; Raymond Decl. ¶ 5; Krop Decl. ¶¶ 4,5,6. See also *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 209 (4th Cir. 2020) (firearms dealers have standing to represent the interests of their customers). Plaintiffs' Second Amendment rights will be lost on a statutory date certain in the near future (January 1, 2027). These harms are thus "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (citation omitted). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). The alleged harms are traceable to SB 334's bans and the requested relief will redress these injuries. Plaintiff MSI has standing to represent the interests of its members, including dealer members. *Hunt v. Wash. State*

13

*Apple Ad. Comm'n,* 432 U.S. 333, 343 (1977); *AAR v. Hudson* 144 F.4th 582 (4th Cir. 2025). See

Johnston Decl. ¶¶ 3-6.

### III.   PISTOLS WITH A CRUCIFORM TRIGGER BAR ARE "ARMS" UNDER *BRUEN*'S STEP ONE

The Second Amendment provides: "A well regulated Militia, being necessary to the security

of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Second

Amendment is applicable to the States as incorporated through the Due Process Clause of the

Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional

right essential to ordered liberty. *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010). "[T]he

Second Amendment embodies a uniform national standard" that is equally applicable to the States

and the federal government. *Wolford v. Lopez*, No. 24–1046, 609 U.S. ---, ---- S.Ct. ----, 2026 WL

1825723 at *5 (U.S. June 25, 2026). "The right protected by the Second Amendment is entitled to

no less protection than other constitutional rights." *Id.* at *11 n.13.

The Supreme Court in *New York State Rifle & Pistol Ass'n. v. Bruen*, 597 U.S. 1, 28 (2022),

established a two-step process for analyzing Second Amendment claims. At the *Bruen* Step One

"stage … the question is simply whether a challenged law falls within the Second Amendment's

'plain text.'" *Wolford,* at *10, quoting *Bruen,* 597 U. S. at 24. "[T]he Second Amendment extends,

*prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at

the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 583 (2008). Under the

Second Amendment, "Arms" comprises "weapons of offence," "armour of defence," and "anything

that a man wears for his defence ... takes into his hands, or useth in wrath to cast at or strike another."

*Heller,* 554 U.S. at 581. "'Arms' ... refers to implements used for offense or defense." *Wolford*, 2026

WL 1825723 at *4, quoting *Heller*, 554 U.S. at 581. "Arms" include items that "facilitate armed

self-defense." *Bruen,* 597 U.S. at 28. See also *Caetano v. Massachusetts*, 577 U.S. 411 (2016); *Nunn*

*v. State*, 1 Ga. 243, 251 (1846) ("The right of the whole people ... to keep and bear arms of every description ... shall not be infringed, curtailed, or broken in upon, in the smallest degree ....").

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen,* 597 U.S. at 24. See also *United States v. Hemani*, 146 S.Ct. 1677, 1685 (2026) ("we begin by asking whether the Amendment's terms cover the conduct in question" and if so "the Constitution 'presumptively' protects it"), quoting *Bruen*, 597 U.S. at 24. "If a challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional." *Wolford*, 2026 WL 1825723 at *6. This textual inquiry is determined by whether "the law place[s] *any restrictions* on either the "keep[ing]" (*i.e.*, possession) or the "bear[ing]" (*i.e.*, carrying) of arms." *Id.*, quoting *Bruen*, 597 U.S. at 32-33. (brackets by the Court) (emphasis added). "[H]istorical materials and precedents" "are out of place at *Bruen*'s first step." *Id.* at *10. Rather, "the question is simply whether a challenged law falls within the Second Amendment's 'plain text.'" *Id.*, quoting *Bruen*, 597 U. S. at 24. A court may not "smuggle additional limits, drawn from our regulatory tradition into the plain-text stage of the inquiry." *Id.* at *14 n.1 (Barrett, J., concurring).

"Arms" under the Second Amendment indisputably includes handguns. *Heller* struck down as unconstitutional the District of Columbia's ban on the possession of handguns, holding that the Second Amendment protects arms that are in common use for lawful purposes, like self-defense, including handguns. 554 U.S. at 624-27. See *Bruen,* 597 U.S. at 32 (noting that is no dispute "that handguns are weapons 'in common use' today for self-defense"), quoting *Heller,* 554 U.S. at 627. *Heller* holds that "the American people have considered the handgun to be the quintessential self-defense weapon." 554 U.S. at 629. Handguns are "the most popular weapon" for "the core lawful purpose of self-defense." *Heller*, 554 U.S. at 629–30. See also *McCoy v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 140 F.4th 568, 575 (4th Cir. 2025), *cert. denied,* 2026 WL 1871297 (U.S. June 30, 2026) ("As *Heller* made clear, handguns are 'Arms' because they are 'the

15

quintessential self-defense weapon.'"), quoting *Heller*, 554 U.S. at 629; *Wolford,* 2026 WL 1825723 at \*4 ("We added [in *Heller*] that handguns, which are 'overwhelmingly chosen by American society' for self-defense, fall squarely into this category"), quoting *Heller*, 554 U.S. at 628.

The text of the Second Amendment necessarily also protects the right of a law-abiding citizen to acquire handguns because a "restriction" on the acquisition of arms is necessarily a "restriction" on the "keeping or bearing" of arms. *Wolford*, 2026 WL 1825723 at \*6. A ban on the sale or acquisition of a handgun obviously "concerns" a "form of 'Arms.'" See *Reese v. BATF*, 127 F.4th 583, 590 (5th Cir. 2025) ("the right to 'keep and bear arms' surely implies the right to purchase them."); *Ortega v. Grisham*, 148 F.4th 1134, 1143 (10th Cir. 2025) ("Common sense dictates that the right to bear arms requires a right to acquire arms, just as the right to free press necessarily includes the right to acquire a printing press, or the right to freely practice religion necessarily rests on a right to acquire a sacred text."); *United States v. Knipp*, 138 F.4th 429, 434 (6th Cir. 2025) ("although the Second Amendment's text does not spell out the right to obtain firearms, it nonetheless 'covers' that right"); *Gazzola v. Hochul*, 88 F.4th 186, 195 (2d Cir. 2023) ("A State cannot circumvent those holdings by banning outright the sale or transfer of common use weapons and necessary ammunition."). *McCoy*, 140 F.4th at 575 ("the parties do not dispute that appellees' intended action—purchasing a handgun for lawful purposes—is part of the 'conduct' protected by the Amendment"). Laws "prohibiting the commercial sale of firearms would be untenable in light of *Heller*." *Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3rd Cir. 2021) (internal citation and quotation marks omitted). See also *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them ").

The right to "keep and bear arms" also protects closely related acts needed to exercise the right itself. See Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 192–94 (2012). The Second Amendment "'wouldn't mean much' without the ability to acquire

16

arms." *Nguyen v. Bonta*, 140 F.4th 1237, 1241 (9th Cir. 2025), quoting *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc); *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024) ("[U]nless the right to acquire firearms receives some Second Amendment protection, the right to keep and bear firearms would be meaningless."); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective.").

The bans imposed by SB 334 fall within the "plain text" of the Second Amendment. *Wolford* holds that a "law . . . clashes with the 'plain text' of the Amendment's language" if it "concern[s] any form of 'Arms' *i.e.,* any weapon customarily used for offensive or defensive purposes." 2026 WL 1825723 at *6. The bans imposed by SB 334 on factory stock Glock pistols and other pistols with a cruciform trigger bar plainly "concern" factory stock Glocks and pistols with a cruciform trigger bar which are indisputably "weapon[s] customarily used for offensive or defensive purposes." See Part II, *infra*. These pistols are thus presumptively protected by the plain text of the Second Amendment. That factory stock Glock pistols or semiautomatic pistols in general did not exist at the Founding is irrelevant. *Heller*, 554 U.S. at 582. The Second Amendment protects "what petitioners want to do," *Wolfo*rd, 2026 WL 1825723 at *9, *viz.*, acquire, sell, offer for sale, purchase, receive or transfer a factory stock Glock handgun or another handgun with a cruciform trigger bar.

*Heller* held and *Bruen* confirms that the Second Amendment protects all weapons that are "'in common use' today for self-defense." *Bruen*, 597 U.S. at 32, quoting *Heller,* 554 U.S. at 627. See also *Rahimi*, 602 U.S. at 735. Determining whether an arm is "in common use" does *not* occur at the plain text inquiry mandated by *Bruen*'s Step One because the Step One inquiry is strictly limited to the text. *Wolford* squarely holds that "historical materials and precedents" "are out of place at *Bruen*'s first step." 2026 WL 1825723 at *10. See also *id.* at *6 ("If a

17

challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional."). Again, the plain text inquiry is determined by whether the challenged law "concern[s] any form of 'Arms,' i.e., any weapon customarily used for offensive or defensive purposes." *Wolford,* 2026 WL 1825723 at *10. Again, the factory stock handguns regulated by SB 334 qualify under that test.

These Step One holdings in *Wolford* effectively abrogate circuit precedent that have held that at Step One a court should "assess the historical scope of the right to keep and bear arms to determine whether the text of the Second Amendment encompasses the right to possess the assault weapons at issue." *Bianchi v. Brown*, 111 F.4th 438, 448 (4th 2024) (en banc). See also *United States v. Price*, 111 F.4th 392, 401 (4th Cir. 2024) (en banc), *cert. denied*, 145 S.Ct. 1891 (2025). This Court is bound by *Wolford*, not these prior decisions. See *Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023) (circuit "precedent ... is not binding if it subsequently proves untenable considering Supreme Court decisions"). Indeed, *Wolford* effectively vindicates Judge Richardson's *Bianchi* dissent and Judge Quattlebaum's concurring opinion in *Price* with respect to the scope of the Step One inquiry. See *Bianchi,* 111 F.4th at 502 (Richardson, J., dissenting); *Price,* 111 F.4th at 415-17 (Quattlebaum, J., concurring) (the "common use" and "dangerous and unusual" inquiries occur "at step two."

## IV.  SB 334'S BANS ON PISTOLS WITH A CRUCIFORM TRIGGER BAR FAIL AT *BRUEN*'S STEP TWO

### A.  Firearms In Common Use For Lawful Purposes Cannot Be Banned

"We therefore move on to the second step." *Wolford,* 2026 WL 1825723 at *10. At Step Two, if the government's restriction implicates the right to keep and bear arms, then it is the State's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. See *United*

*States v. Rahimi,* 602 U.S. 680, 691 (2024) (If the government "regulates arms-bearing conduct, it bears the burden to justify its regulation."). See also *Bruen*, 597 U.S. at 33-34 ("the burden falls on respondents to show that New York's proper cause requirement is consistent with this Nation's historical tradition of firearm regulation"). At Step Two of the *Bruen* analysis, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 692. See also *Hemani*, 146 S.Ct. at 1691 ("'Even when a law regulates arms-bearing for a permissible reason,' we have said, 'it may not be compatible with the [Second Amendment] if it does so to an extent beyond what was done at the founding.'"), quoting *Rahimi*, 602 U. S. at 692. "Why and how the regulation burdens the right are central to this inquiry." *Rahimi,* 602 U. S. at 692. In performing this inquiry under Step Two, courts may not engage in an "ahistorical and 'judge-empowering interest-balancing inquiry.'" *Wolford*, 2026 WL 1825723 at *5, quoting *Heller,* 554 U.S. at 634 (internal quotes omitted). Accord *Bruen*, 597 U.S. at 22.

Factory stock Glocks and other handguns with cruciform trigger bars are arms in common use for lawful purposes under *Heller* and that reality is dispositive of the Step Two inquiry. See Gino Decl. ¶¶ 47-50. As noted, all of these handguns have been approved by the Maryland Roster Board as "useful for legitimate sporting, self-protection, or law enforcement purposes." MD Code, Public Safety, § 5-405(a)(1). And for good reasons. In November 1985, Glock opened its U.S. headquarters, GLOCK, Inc., in Smyrna, Georgia and since then "[o]ver 65% of federal, state and local agencies in the United States have been issued Glock pistols. https://perma.cc/3SGV-82GG. Factory stock Glock pistols are among the most popular handguns in the nation. See How Glock became America's gun, CBS NEWS (Sep.15, 2013), https://perma.cc/4MES-VBX7. Three Glock handgun models made the top 25 for new guns sold in 2024, placing fourth, seventh, and twenty-second. See Logan Metesh, Top Selling New Guns of 2024, GUNS & AMMO (Jan. 14, 2025),

19

https://perma.cc/8A5Z-5VQN. Analysts estimate that, as of 2020, Glock held nearly 65% of the U.S. market for handguns. Gaston Glock & Family, Forbes (Apr. 5, 2021), https://perma.cc/6HWX-6FFP. Glock pistols consistently rank among the top-selling firearms in the U.S. civilian market. See, e.g., Best-Selling Guns, Guns.com (May 5, 2026), https://perma.cc/9JGJ-ZXXN (listing two Glock models in the top-five-selling handguns).

Government data confirms the popularity of these types of handguns. The federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has observed that Glocks are "popular for civilian use." See Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652, 24655 (Apr. 26, 2022). In 2021, Glock manufactured 581,944 handguns in the United States. See ATF Annual Firearms Manufacturing and Export Report at 13 (2021), https://perma.cc/T6FB-YCAY. Of those, just 67,106 were exported. *Id*. at 153. In 2021, 5,263,341 handguns were imported into the United States. See ATF Firearms Commerce in the United States at 3 (2024), https://perma.cc/P689-LX24. Moreover, in 2021, 5,263,341 handguns were imported into the United States. See Firearms Commerce in the United States at 3, ATF (2024), https://perma.cc/P689-LX24. Of those, 1,688,941 (nearly one-third of the total) were imported from Austria (*id*. at 5) where many Glocks are manufactured. See Glock, Glock Brand, https://perma.cc/2UWY-EARR ("our complete line of GLOCK pistols has become the choice for millions who aspire to carry the perfect firearm for the mission at hand"). It is therefore likely that, in 2021 alone, Glock imported hundreds of thousands of handguns for sale in the United States. In short, Glocks are in common use for lawful purposes.

## B.    The Historical Inquiry Under *Bruen's* Step Two

*Bruen* establishes several requirements to determine whether a historical regulation is sufficiently analogous. "'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen,* 597 U.S. at 34, quoting *Heller,* 554 U.S. 634-35. 20th

century and late 19th century statutes and regulations "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen,* 597 U.S. 66 & n.28. "'[P]ost-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Bruen*, 597 U.S. at 29, quoting *Heller v. District of Columbia*, 670 F.3d 1224, 1274 n.6 (D.C. Cir. 2012) (Kavanaugh, J., dissenting). See also *Hemani*, 146 S.Ct. at 1690 (a historical law must have been "focused on protecting the public" in the same concrete sense as the challenged restriction).

Restrictions on the right to keep and bear arms dating from after the Civil War and after the adoption of the Fourteenth Amendment in 1868 may be confirmatory of earlier legislation but cannot be used alone to provide an appropriate historical analogue required by *Bruen*. Only those restrictions with roots in the Founding are sufficiently "enduring" and "well-established" to comport with the Second Amendment's "unqualified command." *Bruen*, 597 U.S. at 24. See also *Hemani,* 146 S.Ct. at 1686 ("the more a modern law diverges from traditional laws in purpose and operation, the less likely it is to survive review"); *Wolford,* 2026 WL 1825723 at \*6 ("acceptance [of a restriction] may be express, as when judicial decisions explicitly acknowledged the rule's legality. Or the acceptance may be tacit, as when a restriction on the keeping or carrying of arms was "open, widespread, and unchallenged."). The historical analogue must be "well-established and representative." *Bruen,* 597 U.S. at 30. Historical "outlier" requirements of a few jurisdictions or of the Territories are to be disregarded. *Id.,* 597 U.S. at 30, 55 n.22, 65. "An outlier legal rule adopted in a few locales is not enough." *Wolford,* 2026 WL 1825723 at \*11. See also *Id.*, at \*13 ("a lone statute adopted nearly a century after the adoption of the Second Amendment and well after the adoption of the Fourteenth Amendment sheds little if any light on the meaning of the Second Amendment right"); *Id.* at \*14 (a statute that "was neither widespread nor widely accepted … carries no weight"). Late 19th and early 20th century analogues are too late. See *Bruen,* 597 U.S. at 66 n.28.

21

The historical analogue must be "relevantly similar," which is to say that it must burden ordinary, law-abiding citizens' rights in a similar manner and for similar reasons. *Bruen*, 597 U.S. at 28-29; *Wolford*, 2026 WL 1825723 at *13. That inquiry is controlled by two "metrics" of "how and why" any restriction was historically imposed during the Founding era. *Bruen*, 597 U.S. at 29. As stated in *Wolford*:

> Determining whether this condition is met requires consideration of 'how' the analogue restricted the keeping or bearing of arms—that is, whether it imposed a restriction similar to that imposed by the challenged law. And a court must also consider 'why' the analogue restricted the keeping or bearing of arms—that is, whether its rationale was similar to that of the new law.

2026 WL 1825723 at *6.

Courts must assess "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 597 U.S. at 29. "[T]he relevant question under *Bruen* ... is not simply whether two laws targeted similar conduct. It is instead *why* they targeted that conduct—that is, what 'reason' justified the restriction." *Wolford,* 2026 WL 1825723 at *19 n.10 (Barrett, J., concurring).

In cases where "the modern law addresses a situation that could not have arisen when the Second or Fourteenth Amendment was adopted," "it is too much to demand a close match." *Wolford,* 2026 WL 1825723 at *6. But even in such cases, "the 'how' and 'why' of the historical analogue and modern regulation must be close enough to enable a court to say: 'Because this historical law was understood to be compatible with the right codified by the Second Amendment, we can infer that the restriction imposed by the modern law is likewise consistent with that right.'" *Id.* In such instances, "application of step two of the *Bruen* framework called for" analogues that "were sufficiently similar to support the provision's constitutionality because the challenged regulation was 'consistent with the principles that underpin our regulatory tradition.'" *Wolford*, 2026 WL 1825723 at *7, quoting *Rahimi,* 602 U.S. at 698-99.

22

The historical analysis is a legal inquiry which is appropriately presented in briefs. See *Bruen*, 597 U.S. at 25 n.6 (noting that the historical inquiry presents "legal questions" that judges can address) (emphasis in original). See also *id.* at 33 n.8 (rejecting the dissent's suggestion that further fact-finding was needed and holding that its ruling did not "depend on any of the factual issues raised by the dissent"). The historical inquiry is a matter of legislative facts and poses questions of constitutional law for the Court. See, e.g., *Nathan v. Alamo Heights Indep. School District*, 173 F.4th 576, 607-08 & n.57 (5th Cir. 2026) (collecting authorities). Expert testimony on such matters is neither appropriate nor probative. *Id.* Accordingly, the required analogue inquiry does not require fact-finding by a court or opinion testimony of expert witnesses.

**C.      The State Cannot Carry Its Burden At Step Two Of Bruen**

**1.      SB 334 fails the "how" and "why" inquiries**

The scope of common law duties and responsibilities with respect to firearms at the Founding is highly relevant with respect to the meaning and scope of the protections codified in the Second Amendment. See *Bruen*, 597 U. S., at 39 ("'[T]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument was framed and adopted*'"); *Rahimi,* 602 U.S. at 697 (relying on "the ancient common-law prohibition on affrays"); *Wolford*, 2026 WL 1825723 at *7 (relying on the common law of trespass); *McCoy,* 140 F.4th at 572, 574 (relying on the common law with respect the rights of persons under the age of 21). The sale, purchase, offer for sale, receipt and transfer of a handgun, as regulated by SB 334, is all conduct "that could have occurred when the Second and Fourteenth Amendments were adopted." *Wolford*, 2026 WL 1825723 at *7. The "how" inquiry mandated by *Bruen* requires that government prove well-established and representative analogue restrictions whose "how and why" were "similar to that imposed by the challenged law." *Id*. at *6.

23

Step Two of *Bruen* thus places the burden on the State to show, as a matter of history and tradition, that Glocks and other pistols with a cruciform trigger bar are not in common use for lawful purposes. In an alternative holding, *Bianchi* held that "assault weapons" were not protected at Step Two because they were like other weapons that "were particularly suitable for fighting and 'popular[ ] with street criminals.'" 111 F.4th at 466-67 (citation omitted). That holding and its reasoning will undoubtedly be addressed directly by the Supreme Court this next Term in *Viramontes v. Cook Co.*, No. 25-238, *cert granted,* 2026 WL 1871322 (U.S. June 30, 2026). For purposes of this case, it is sufficient to note that nothing in *Bianchi* involved otherwise lawful firearms that had been approved by the Maryland Roster Board as "useful for legitimate sporting, self-protection, or law enforcement purposes." MD Code, Public Safety, § 5-405(a)(1). Nothing in *Bianchi* involved handguns that were banned **only** because they were capable of being readily converted **by criminals** into weapons that were **unlawful** to possess under State and federal law. Similarly, *Price* concerned firearms with obliterated serial numbers which are illegal to possess under 18 U.S.C. § 922(k). *Bianchi* and *Price* cannot be stretched to apply to ordinary handguns approved by the Maryland Roster Board for civilian sale and use. See Monica Decl. ¶¶ 47-61. Indeed, *Price* did not conduct a *Bruen* Step Two analysis at all. 111 F.4th at 402.

As a matter of law, a firearm in "common use for lawful purposes" cannot be "dangerous and unusual" under *Heller*. See *Price,* 111 F.4th at 417 (Quattlebaum, J., concurring) ("weapons in common use for lawful purposes and 'dangerous and unusual weapons' are opposite sides of the same coin"). Historically "dangerous and unusual weapons" are only those weapons which were "highly unusual in society at large," like illegal sawed off shotguns or machine guns. *Heller,* 554 U.S. at 625. See *Bianchi*, 111 F.4th at 499 ("the historical tradition of prohibiting the carry of 'dangerous and unusual weapons' . . . only extends to weapons 'commonly used by criminals'") (Richardson, J., dissenting), quoting *Heller*, 554 U.S. at 623. See *United States v.*

24

*Bridges,* 150 F.4th 517, 527 (6th Cir. 2025) (holding that machine guns are "arms" at Step One but fail at Step Two because they have "been unlawful since 1986"). As explained above, there is nothing "highly unusual in society at large" about Glock pistols or other pistols with a cruciform trigger bar. See also Monica Decl. ¶¶ 47-61. Again, all these pistols have met the statutory criteria for inclusion on the Roster, *viz,* "are useful for legitimate sporting, self-protection, or law enforcement purposes." MD Code, Public Safety, § 5-405(a)(1). The State cannot meet its burden of showing that these pistols are "dangerous and unusual."

SB 334 also fails the "how" inquiry, as clarified by *Wolford.* There is simply no historical analogue from any relevant era that imposed restrictions on ordinary handguns "similar to that imposed by" SB 334. *Wolford,* 2026 WL 1825723 at *6 ("Determining whether this condition is met requires consideration of 'how' the analogue restricted the keeping or bearing of arms—that is, whether it imposed a restriction similar to that imposed by the challenged law."). Maryland's restrictions are a modern-day outlier; only Maryland, California and Connecticut have enacted such laws. *Heller* squarely holds that handguns cannot be banned because they "are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629. As explained, that ruling applies equally to "any restriction" on acquisition because a gun that cannot be acquired cannot be kept or borne. Historically, there were no bans on mere acquisition of handguns by law-abiding adults. See *Hemani,* 146 U.S. at 1689-90. The State loses on this ground alone.

SB 334 also fails the "why" inquiry, as clarified by *Wolford,* which holds that the government must prove well-established and representative analogue restrictions whose "rationale was similar to that of the new law." *Wolford,* 2026 WL 1825723 at *6 ("And a court must also consider 'why' the analogue restricted the keeping or bearing of arms—that is, whether its rationale was similar to that of the new law."). See also *Hemani*, 146 S.Ct. at 1687 (rejecting

25

the government's suggested analogues because they "targeted different kinds of people, did so for different purposes, and operated in different ways").

Here, the stated "rationale" for the bans imposed by SB 334 is that pistols with a cruciform trigger bar are "readily convertible" into illegal machine guns. MD Code, Criminal Law, §§ 4-302(o), 4-305.2. SB 334 provides "'machine gun convertible pistol' does not include a hammer–fired semiautomatic pistol or a striker–fired semiautomatic pistol without a cruciform trigger bar." MD Code, Criminal Law, § 4-301(o)(3). Accordingly, the burden is on the State to show well-established, representative historical analogues that share that same "rationale." Again, it cannot carry that burden. Stated simply, there are no "principles that underpin our regulatory tradition," *Rahimi,* 602 U.S. at 692, that support a ban of a firearm in common use for lawful purposes merely because a criminal can illegally convert that firearm into an illegal firearm that is dangerous and unusual. Accepting SB 334's rationale would mean that Maryland could ban the sale of an ordinary shotgun merely because a criminal could readily shorten the barrel in minutes to less than 18 inches with a common hacksaw, https://bit.ly/4wD9nbt, thereby converting the shotgun into an illegal short-barrel shotgun under the National Firearms Act, 26 U.S.C. §§ 5845(a), 5861(d). See *Heller*, 554 U.S. at 621-23 (distinguishing *United States v. Miller*, 307 U.S. 174, 179 (1939)). SB 334's "rationale" for illegality thus proves too much.

### 2.    SB 334 is not supported by the common law

At common law, there is no national "historical understanding of the codified right," *Wolford*, 2026 WL 1825723 at *6, that imposed a duty on manufacturers and sellers of firearms to protect the public "from the adverse effects associated with a lawful product being diverted, misused, or abused." *Express Scripts, Inc. v. Anne Arundel Co.*, 493 Md. 329, 408-09 (2026). That rule protects manufacturers and sellers of firearms. See *City of Chicago v. Beretta U.S.A. Corp.*, 290 Ill.Dec. 525, 821 N.E.2d 1099, 1116 (2004) (holding there was no "public right to be

26

free from the threat that some individuals may use an otherwise legal product (be it a gun, liquor, a car, a cell phone, or some other instrumentality) in a manner that may create a risk of harm to another"); *Dist. of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 648–51 (D.C. 2005) (en banc) (same); *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 309 A.D.2d 91, 96, 761 N.Y.S.2d 192 (App. Div. 2003) (same). Similarly, the Protection of Lawful Commerce in Arms Act relies on the common law to preclude civil litigation "trying to hold gun companies liable in tort for harms 'caused by the misuse of firearms by third parties, including criminals.'" S*mith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 285 (2025), quoting 15 U.S.C. § 7901(a)(3). See 15 U.S.C. § 7901(a)(7) (Congressional finding that such litigation was "based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bona fide expansion of the common law").

There is likewise no common law tradition that imposed a duty on manufacturers and sellers of firearms to protect the public "against the actions of third parties," especially where those actions of third parties were criminal in nature. *Valentine v. On Target, Inc.*, 353 Md. 544, 553 (1999) (involving a criminal theft of a firearm). "When the harm is caused by a third party, rather than the first person … our inquiry is not whether the harm was foreseeable, but, rather, whether the person or entity sued had control over the conduct of the third party who caused the harm by virtue of some special relationship." *Warr v. JMGM Group, LLC*, 433 Md. 170, 184 (2013). See also *Mayor & City Council of Baltimore v. BPPLC*, 493 Md. 427, 505-06 (2026) (same); Restatement of Torts (Second) § 315 (1965) (same). There is, accordingly, no "historical understanding," *Wolford,* 2026 WL 1825723 at *6, of the Second Amendment that shares the same "rationale" for the bans imposed by SB 334. *Id.* The State loses for this reason as well.

27

## IV. THE VIOLATION OF PLAINTIFFS' SECOND AMENDMENT RIGHTS CAUSES IRREPARABLE HARM

"The denial of a constitutional right, if denial is established, constitutes irreparable harm." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); see also *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). That is why "[w]hen an alleged deprivation of a constitutional right is involved ... most courts hold that no further showing of irreparable injury is necessary." A Wright & Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2022). There is no "hierarchy of constitutional rights." C*aplin & Drysdale, Chartered v. United States*, 491 U.S.617, 628 (1989). Thus, in *Kipke v. Moore*, 695 F.Supp.3d 638, 662 (D.Md. 2023), *aff'd in part,* 165 F.4th 194 (4th Cir. 2026), this Court ruled that "[t]he deprivation of a constitutional right 'unquestionably constitutes irreparable injury.'" (Quoting *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022)). The same result obtains here for the same reason.

As *Kipke* implicitly recognized, the Second Amendment is entitled to same recognition accorded to "other Bill of Rights guarantees." *Bruen,* 597 U.S. at 70. To hold otherwise would be to impermissibly "subject" the Second Amendment "to an entirely different body of rules." *Id.* "The right protected by the Second Amendment is entitled to no less protection than other constitutional rights." *Wolford*, 2026 WL 1825723 at *11 n.13. "[W]hen the government crosses the line from permissible regulation into unconstitutional infringement, courts have a duty to say so in the cases before them—no less in the Second Amendment context than in any other." *Hermani*, 146 S.Ct. at 1685.

The dealer Plaintiffs also face the irreparable loss of sales opportunities and destruction of the value of existing inventory. See Raymond Decl. ¶¶ 4,5; Krop Decl., ¶¶ 4-6. Their customers are irreparably harmed because they can no longer acquire these pistols. Rendered valueless are the Glocks used by plaintiffs Duffy, Peter and The Machine Gun Nest in conducting paid

instruction. See Duffy Decl., ¶¶ 5,6; Peter Decl. ¶ 6; Krop Decl. ¶ 5. SB 334 bans future acquisition of Glocks, forces these plaintiffs to abandon their existing use of Glocks and incur the cost of acquiring *less suitable* replacement pistols for instruction classes. *Id.* SB 334 permits only "the temporary *gratuitous* exchange of a machine gun convertible pistol." MD Code, Criminal Law, § 4-302(13) (emphasis added). That provision rules out temporary transfers or receipts of Glocks by students in *paid* instruction. Because only prospective equitable relief is available in this case, *Hafer v. Melo*, 502 U.S. 21, 30-31 (1991), none of these losses can be remedied by a damages award. See, e.g., *Georgia v. Pres. of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022) ("unrecoverable monetary loss is an irreparable harm."); *Johnson & Johnson v. Samsung Bioepis Co. Ltd.*, 173 F.4th 454, 463-64 (3d Cir. 2026) (same).

## VI.    THE OTHER FACTORS WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION

When the State is the opposing party to a preliminary injunction, the last two factors—the balance of equities and the public interest—merge. *Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020). The State has no interest in enforcing an unconstitutional law because "upholding constitutional rights is in the public interest." *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011). "A state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (internal quotation marks omitted). See *Kipke,* 695 F.Supp.3d at 662-63.

## CONCLUSION

For all the foregoing reasons, this Court should grant Plaintiffs' motion and preliminarily enjoin the enforcement of SB 334.

Respectfully submitted,

29

*/s/ Mark W. Pennak*

Matthew Larosiere*                     Mark W. Pennak
6964 Houlton Cir.                      MARYLAND SHALL ISSUE, INC.
Lake Worth FL 33467                    9613 Harford Rd, Ste C #1015
Larosieremm@gmail.com                  Baltimore, MD 21234-21502
*Bar application pending                mpennak@marylandshallissue.org
                                        Phone: (301) 873-3671
                                        District Court Bar # 21033
Dated: July 13, 2026                   *Counsel for Plaintiffs*

30